Jerry D. SALLEY and Emily B. Salley, Plaintiffs/Appellants,

v.

THE PICKNEY COMPANY, a partnership, Pickney Brothers Construction Company, a partnership, Robert J. Pickney and Tom Pickney, Defendants/Appellees.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Oct. 7, 1992.

Application for Permission to Appeal Denied by Supreme Court March 1, 1993.

Robert G. Wheeler, Jr., Goodlettsville, for plaintiffs/appellants.

Henry Haile, Nashville, for defendants/appellees.

## OPINION

LEWIS, Judge.

Plaintiffs have appealed from the trial court's dismissal of their complaint after finding that plaintiffs had a duty to mitigate their damages following defendants' breach of contract and that they failed to do so.

This suit arose out of a contract entered into by plaintiffs, Jerry D. Salley and wife, Emily Salley (Homeowners), and the defendants (Contractors) whereby the Contractors agreed to raise the Homeowners' home which sits along the Dry Creek flood plain in Goodlettsville, Davidson County, Tennessee.

The United States Corps of Engineers (the Corps) approved a plan whereby the Corps would pay or "help pay for the raising of the homes along the flood plain." The Corps agreed to pay $31,000.00 for the raising of plaintiffs' home.

After some negotiations, the Homeowners entered into a contract with Contractors for the Contractors to raise plaintiffs' home for the sum of $31,000.00. The contract provided, *inter alia*, that the house would be raised a minimum of 4.67 feet and Contractors would provide a two-year systems and ten-year structural warranty plan to the Homeowners through the Home Buyers Warranty Program.

The Homeowners filed this complaint and alleged, *inter alia*, that the Contractors: 1) failed to hire duly qualified and experienced workers to carry out the contract; 2) failed to obtain the necessary permits for plumbing and electrical work prior to performing the work; 3) failed to utilize licensed plumbers and electricians; 4) violated the building regulations of the City of Goodlettsville, Tennessee; 5) refused to provide Homeowners with full and complete releases and executed affidavits of all persons who furnished materials and labor as requested by the Homeowners; and 6) failed to provide the warranty from Home Buyers Warranty Program.

The Homeowners sought a declaration that the Contractors had breached the contract and asked for a determination by the court of how much of the $31,000.00 [1] should be paid to the Contractors for work performed under the contract and how much should be paid to the Homeowners due to the Contractors' breach.

The Homeowners' home is located along the Dry Creek flood plain. The United States Corps of Engineers approved a plan whereby it would pay or help pay for the raising of the houses along the flood plain. In the instant case, the Homeowners invited bids from several contractors for work to be done and submitted the bids to the Corps. The Corps determined the amount of money it would pay for the work. In this case, the Corps determined that it would pay $31,000.00. The Homeowners then entered into an agreement with the Contractors for the work to be done and the Contractors agreed to perform the work for the amount of money designated and to be paid by the Corps.

The Homeowners in the instant case considered the bid of Joe Asher, a contractor who had previously raised some houses in the area, and were seriously considering awarding the contract to Mr. Asher. At this time the Homeowners were solicited by the Contractors and specifically defendant Robert Pickney, who made several calls to the Homeowners. Pickney was advised by the Homeowners that they were considering awarding the contract to Joe Asher. However, Mr. Pickney persisted in the discussions and offered, as an additional inducement to the Homeowners, a Home Buyers Warranty, which would have provided the Homeowners a two-year systems and ten-year structural warranty. The evidence is that the warranty was the determining factor in the Homeowners' decision to enter into the contract with the Contractors.

Upon deciding to have Contractors raise the house, the Homeowners entered into a Participation Agreement with the Corps and the Contractors on 19 June 1989,

---

1. Plaintiffs lodged the $31,000.00 check, payable to plaintiffs and defendants and received by plaintiffs from the Corps of Engineers, with the court at the time they filed their complaint.

whereby the Contractors agreed "to raise in place, consistent with approved building codes, the first habitable floor of [the Homeowners'] residence." The Agreement provided that the Corps would issue a check in the amount of $31,000.00 "payable jointly to the Salleys and Pickney Brothers Construction Company, Inc." Prior to the execution of the Participation Agreement, the Corps issued a letter to the Contractors who had submitted bids advising them of requirements for the work to be performed. This letter stated that payment by the Corps would be made for the raising of the homes and for work necessary "to restore the residence and lot to its pre-raised functionability, accessability and aesthetic value."

Prior to the execution of the Participation Agreement, the Homeowners entered into a contract, dated 14 June 1989, with the Contractors for the work to be performed. The contract contained, *inter alia,* the following provision:

1. *Work to be Performed.* The contractor shall perform for owner, in a substantial and workmanlike manner and subject to the provisions hereof, the work described in Exhibit A attached hereto....

3. *Time of Work.* Contractor will perform the work required between the hours of 7:00 a.m. and 6:00 p.m., Monday through Saturday.

7. *Payment.* The contractor shall receive in respect of said work and materials the sum of thirty-one thousand ($31,000) dollars, the same to be delivered to the contractor when received by the owner from the Corps and upon the satisfactory completion of the work herein described. Owner agrees to request payment from the Corps of Engineers as soon as job is substantially complete, and meets the requirements set by the Corps.

10. *Warranty of Work.* Contractor will provide to the owner a two year systems and ten year structural warranty plan from Home Buyers Warranty Program.

The Home Buyers Warranty, a copy of which was introduced into evidence without objection, established the protection offered by the warranty which the Contractor agreed to procure for the Homeowners. The warranty provided in regard to structural defects as follows:

What the Service and Insurer will Do

A. Subject to the warranty limits, if a Structural Defect is covered by this warranty, the Insurer, on a claim made by the Builder or Homebuyer(s) through the Service, will repair and/or replace the Structural Defects or make arrangements for such repairs and/or replacement. The Service and Insurer shall have complete discretion as to the methods and manners for repairing and/or replacing Structural Defects. No repairs or replacements made under the terms and conditions of the warranty shall act to extend the Warranty Term or Extended Warranty Term.

B. The repair of a Structural Defect is limited (1) to the repair of damage to the load-bearing portions of the Home themselves which is necessary to restore their load-bearing ability; and (2) to the repair of those items of the Home damaged by the Structural Defect which make the Home unsafe, unsanitary or otherwise unlivable.

The definition of "Structural Defect" under the warranty includes "physical damage" to, among other items, "beams," "girders," "lintels," "columns," "walls and partitions," and "floor systems."

On 24 June 1989, after the contract was entered into and without any prior notice to Homeowners, a subcontractor hired by the Contractors arrived at the Homeowners' residence at approximately 8:30 p.m. and began removing brick from the exterior. The contract specifically states that work is to be performed between the hours of 7:00 a.m. and 6:00 p.m. The subcontractor, Mike Christian, began removing brick with a sledgehammer. In doing so, Mr. Christian caused the television cable box wire to be ripped out of the back of the cable box. He also ripped the telephone cable from the side of the house and then, as he went around to the front of the house, knocked off a water spigot and caused water to "go

everywhere." The Homeowner was finally able to cut the water off at the street, but didn't have any water to his home. Mr. Christian continued to knock the brick off the house with a sledgehammer into the night by pulling his truck up to the house and turning on the headlights so he could see. When Mr. Salley asked, "What are you doing? Why are you breaking everything," and he said, " 'Well, that's just the way you've got to take it off.' He was apologetic for breaking my water off."

When preparations were made for the actual raising of the house, the Contractors placed beams under the house in a parallel fashion and, with hydraulic hand jacks, started jacking up one end of the house. They would then run to the other end of the house and hand-jack the other end. According to the testimony of Plaintiff, Jerry D. Salley, "They literally rocked my home up this way. When I asked Mr. Pickney, 'What is he doing to my house? You told me he was going to raise my house simultaneously.' To which he [Mr. Pickney] looked right at me and he said: 'I thought he was too.' "

By raising the home in this manner they caused the doors to be crooked so that they no longer opened. Every wall in the house cracked with the exception of the kitchen and dining room, which are wood paneling. The kitchen cabinets fell away from the ceiling.

In addition, Contractors placed the water heater above a stairway which was totally enclosed by a drywall panel. It was accessible only by placement of a ladder on the stairway and the complete removal of the drywall panel.

They improperly poured brown aggregate stone exterior steps which resulted in cracking and breaking off of the aggregate. This was later patched with gray cement. The Contractors placed the lower downspout extension on the inside of the upper downspout which permitted water to flow outside of the guttering and against the house, causing water to enter the basement. The Contractors failed to properly secure support columns so they would be anchored at the top and bottom. They left unrepaired the floor joists which had been cut to accommodate the beams used to raise the house, and some of which were fractured or damaged in the raising process. The support function of these floor joints was compromised. The Contractors failed to provide lintels and headers over the basement windows causing cracks in the surrounding masonry foundation and jeopardizing the structural integrity of the house.

Plaintiffs' first issue is: "The Trial Court's Memorandum Opinion is legally deficient in that it fails to address issues raised at trial, fails to include findings of fact pursuant to those issues, and makes findings on issues which were not before the Court during the trial."

In its memorandum, the trial court stated that the issues tried were: "1) whether the defendants breached the contract by failing to perform the work in a workmanlike manner; and 2) what amount, if any, of damages are the plaintiffs entitled to recover."

The trial court did not specifically find that the Contractor had breached the contract, but by necessary implication did so find. The court found that the "plaintiffs had an obligation to mitigate their damages by giving the defendants an opportunity to cure the claimed defects" and that they failed to do so by "refusing to allow the defendants on their property." The court then held that "with respect to [the claimed defects], the plaintiffs are without a remedy against the defendants. The defendants are entitled to the contract price of $31,000, plus prejudgment interest dating from October 3, 1989."

The court found that the Contractors "made a good faith promise to provide the two year system, 10 year structural warranty; however, upon attempting to obtain the warranty the defendants discovered the warranty is not available in Tennessee for this type of project." When the defendants offered to provide their company warranty, the plaintiffs refused. The court then found that the plaintiffs' only remedy was for $400.00, "the original price of the warranty."

The District Court for the Middle District of Tennessee has stated:

> The purpose of the rule concerning damages for breach of contract is to put the injured party in as good a position as he would have occupied had complete performance been rendered by the defaulting party at the least necessary cost. 5 Corbin, *Contracts*, § 1039 at p. 204. Furthermore, a "plaintiff is never given judgment for damages for losses that he could have avoided by reasonable effort without risk of other substantial loss or injury."

*Tampa Electric Co. v. Nashville Coal Co.,* 214 F.Supp. 647, 652 (M.D.Tenn.1963). The court further stated on the issue of plaintiffs' duty to mitigate damages:

> If such plaintiff fails to exercise the "reasonable effort" and, consequently, his injuries are increased, then he cannot recover for the amount by which his injuries were so increased. However, the burden of showing that losses could have been avoided by reasonable effort and expense is on the party who breached the contract. Also, where the wronged party, in making a reasonable attempt to avoid the consequences of defendant's breach, incurs losses or additional expenses, such losses or additional expenses are recoverable as damages. *Restatement Contracts*, § 336(2).

*Id.* at 652.

In *Action Ads, Inc. v. William B. Tanner Co.,* 592 S.W.2d 572 (Tenn.App.1979), this Court quoted extensively from *Tampa Electric Company* in addressing the reasonable standard of a duty to mitigate as follows:

> The critical factor in determining fulfillment of a plaintiff's duty to mitigate is whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time. The rule with respect to the mitigation of damages may not be invoked by a contract breaker "as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." As stated in McCormick, Damages, Sec. 35 (1935), "a wide latitude of discretion must be allowed to the person who by another's wrong has been forced into a predicament where he is faced with a probability of injury or loss. Only the conduct of a reasonable man is required of him."

*Id.* at 575 (citation omitted).

We are of the opinion after a review of this record that the Homeowners acted reasonably under the circumstances in refusing to allow the Contractors to come back to work on their home. The record is replete with evidence of the defects in the Contractors' work. The plaintiffs' expert testimony showed that the cumulative effect of the defects caused by the Contractors rendered the Contractors' performance unworkmanlike, thereby constituting a breach of contract. Some of the evidence demonstrating this unworkmanlike performance is as follows: 1) raising the house one end at a time. This was not contemplated by the Contractors and was not done by any of the other contractors in the area, nor by the defendant Contractors after first raising the plaintiffs' home; 2) attempting to cut off a railing post cap rather than properly constructing the railing; 3) failure to construct the floor and walls of a room so that the floor and wall meet. There was an opening between the two sufficient to place a person's hand; 4) dumping the remains of the pre-existing concrete porch next to the house and covering this over rather than hauling off the remains as required in the contract; 5) patching the brown aggregate stone steps and landing with gray cement; 6) improperly placing the downspout from the roof gutter over the outside of the connected extension piece, thereby causing water to flow on the outside of the connecting downspout and against the wall of the house and causing the basement wall and floor to be damp; 7) tearing the brick off the exterior of the home in the darkness and doing so in such a careless and reckless manner as to pull the cable television connection through the exterior wall and rip it from the cable tuner box; 8) disconnecting and disrupting plaintiffs' telephone service by severing the

telephone line leading into the plaintiffs' house; and 9) rupturing a waterline by breaking off an exterior water faucet.

Additionally, when Mrs. Salley pointed out to defendant Tom Pickney that they could not dig a flower garden on the side of the house because of the buried concrete remains of the old porch, defendant Pickney graciously offered to give her a sledgehammer and suggested that she break up the concrete slab rather than offering to haul it off as the contract provided. Mr. Salley inquired of Mr. Pickney about the placement of the water heater over the stairway on a platform completely enclosed by drywall. When he asked how he could determine when the water was leaking, he was informed by Mr. Pickney that when he saw water coming through the drywall he would know it was leaking.

We are of the opinion that this record shows that the Homeowners acted in a reasonable manner in refusing to allow the Contractors to come back into their home to make repairs.

We are also of the opinion that the failure of the Contractors to provide the Homeowners Warranty was a substantial and material breach of the contract. The evidence is clear that the primary reason the Homeowners awarded the contract to defendant Pickneys was their assurance that they would furnish the Home Buyers Warranty. Contrary to the finding of the trial court, this breach entitled Homeowners to more than the $400.00 anticipated cost of the warranty.

The judgment of the trial court dismissing plaintiffs' complaint for their failure to mitigate damages is reversed and the cause remanded to the trial court for a hearing on the amount of damages to which the Homeowners are entitled resulting from the defendants' breach of the contract, the collection of costs, which are assessed against the defendant Contractors, and for any further necessary proceedings.

TODD, P.J., and CANTRELL, J., concur.