IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
SEPTEMBER 18, 2000 Session

## STANLEY J. KLINE, ET AL. v. WILLIAM I. BENEFIEL, ET AL.

**Direct Appeal from the Circuit Court for Shelby County**
**No. 59043 T.D.;  The Honorable Jon Kerry Blackwood, Judge, by Designation**

---

**No. W1999-00918-COA-R3-CV - Filed January 9, 2001**

---

This case arises from a home construction contract entered into by the Appellants and the Appellees. The Appellants filed a complaint against the Appellees in the Circuit Court of Shelby County for breach of contract.  The Appellees filed a counter-complaint for breach of contract and unjust enrichment. The Appellants filed an amended complaint for violations of the Tennessee Consumer Protection Act.  The trial court dismissed the Appellees' counter-complaint and found in favor of the Appellees as to the Appellants' complaint.

The Appellants appeal from the order of the Circuit Court of Shelby County, finding in favor of the Appellees.  For the reasons stated herein, we affirm the trial court's decision.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY KIRBY LILLARD, J., joined.

David A. Siegel, for Appellants

Ralph D. Golden, for Appellees

**OPINION**

### I.  Facts and Procedural History

On September 17, 1991, the Appellants, Stanley J. Kline and Sandra C. Kline ("the Klines") entered into a home construction contract with the Appellees, William L. Benefiel ("Mr. Benefiel") and Robert Benefiel, Individually and d/b/a Benefiel Homes, a Tennessee General Partnership ("Benefiel"). The Klines originally had contracted with another home builder, but this contract was terminated after problems with the lot arose.  In their search for a new builder, the Klines interviewed Mr. Benefiel and read his advertisement brochure.   The brochure states that "[Mr. Benefiel] became an engineer with several leading firms and eventually owned his own engineering/surveying firms . . . ."  Mr. Kline claims that Mr. Benefiel also orally represented that he was an engineer and could handle the Klines' structural concerns.

Mr. Benefiel is a home builder and holds a general contractor's license. He states that he worked as a draftsman for several engineering firms; however, he is not an engineer. Mr. Benefiel insists that he never told the author of the advertisement brochure that he was an engineer. Mr. Benefiel was aware that the brochure stated that he was an engineer, but he did not think it was important to correct the brochure since he was not working in the engineering field. Mr. Benefiel also asserts that he never orally represented to the Klines that he was an engineer. Mr. Benefiel claims that his wife told Mrs. Kline that Mr. Benefiel was not an engineer. Mrs. Kline denies this conversation took place. The Klines claim they were searching for a builder with "special expertise" and never would have contracted with Mr. Benefiel had they known he was not an engineer and had misrepresented himself as such. Mr. Benefiel argues that the brochure is not the cause of any injury the Klines may have incurred.

Construction on the home began in the fall of 1991. Generally, Mrs. Kline was at the house daily. Mr. Benefiel claims it was difficult to work because Mrs. Kline often spoke with the subcontractors, and she was constantly making changes. Mrs. Kline denies that she bothered or made demands on Mr. Benefiel and the subcontractors. The Klines moved into the house on April 24, 1992. This move-in date was beyond Mr. Benefiel's sixth month deadline to have substantially completed work on the house. Section two of the contract imposes a penalty upon Mr. Benefiel for failure to meet the construction deadline.[1] Mr. Benefiel cites bad weather, numerous changes made by the Klines, and general problems in constructing the house for the delay. The Klines argue that they did not delay Mr. Benefiel, and bad weather and problems in constructing the house had very little to do with the delay. Mr. Benefiel submitted to the Klines a builder fee for $3,727.24 due as of June 10, 1992, but the Klines never paid the bill.

The Klines state that they informed Mr. Benefiel of defects both prior to and after they moved in the house. They claim that Mr. Benefiel refused to correct any of the defects. In August, 1992, the Klines sent Mr. Benefiel a letter outlining sixty-five defects in the house. Mr. Benefiel invoked section six of the contract which provided for a third party to inspect the house and make binding determinations on the parties as to what items were defective.[2] Mr. Benefiel selected Donald

---

[1]The penalty clause of section two of the contract states:

> Owner agrees that the maximum liability amount that Contractor shall be held liable for and penalized for if he takes longer than the approved length of time shall be calculated at fifty dollars ($50.00) per day or no more than ten percent (10%) of the total Builders Fee, for not being able to complete work on time.

[2]Section six, paragraph two of the contract states:

> If owner and contractor should disagree over completed work that owner deems defective, the contractor has the right to have a third party that is mutually respected and approved by both owner and contractor and qualified in the particular field that is in question to make determinations of what is good and acceptable and what shall

(continued...)

Merritt ("Mr. Merritt") to inspect the house. Mr. Merritt inspected the house on October 22, 1992. Mr. Merritt found approximately fifteen of the sixty-five items to be defective.

Both the Klines and Mr. Benefiel state that they agreed to be bound by Mr. Merritt's report pursuant to section six of the contract. The Klines argue that Mr. Benefiel breached the contract because he refused to comply with Mr. Merritt's report. One particular point of contention between the Klines and Mr. Benefiel is that Mr. Merritt's report stated that the Mexican tile in the house was defective. Mr. Benefiel argues that he should not be responsible for repairing the Mexican tile because the Klines directly contracted for the Mexican tile with Lynn & Adams Tile Company ("Lynn & Adams"). Section nine of the contract states that Mr. Benefiel is responsible only for the work of subcontractors with whom he contracts.[3] Mr. Benefiel gave the Klines the name of a tile installer that he used as a subcontractor. The Klines decided not to use this subcontractor, and they looked for another tile installer. Mrs. Kline contacted Bob Lynn ("Mr. Lynn"), a tile installer with Lynn & Adams. Mr. Lynn ordered the tile, and his partner, Hugh Adams ("Mr. Adams") installed the Mexican tile in the house. Mr. Lynn stated that when he began speaking with Mrs. Kline about installing the tile he did not know Mr. Benefiel was involved in the job. Mr. Benefiel claims that he did not speak to Mr. Lynn before the tile work began.

Mrs. Kline was not satisfied with the Mexican tile. She held two meetings with Mr. Lynn to discuss her complaints with the Mexican tile. Mr. Lynn stated that Mr. Benefiel attended both of these meetings. Whitney Cook ("Ms. Cook"), an expert in refinishing Mexican tile, was brought in to restrip and reseal the tile. Mr. Lynn agreed to pay Ms. Cook for her work if Mrs. Kline was satisfied. After Ms. Cook finished the work, Mrs. Kline stated she would "have to live with it," and Mr. Lynn paid Ms. Cook. Lynn & Adams submitted the bills for the Mexican tile to Mr. Benefiel who submitted them to the Klines for payment. On other items for which the Klines directly contracted, however, Mr. Benefiel did not submit a check to the Klines. Mr. Benefiel stated that he thought he was responsible for supervising the Mexican tile work. He claims he did not realize that under the contract he did not have supervisory responsibility over subcontractors with whom the Klines directly contracted.

---

[2](...continued)
> be deemed to be defective. Both parties shall be bound to accept the third parties' recommendations as final without any legal or court litigation.

[3]Section nine, paragraph one of the contract states:
> The Contractor be shall [sic] responsible for only the sub contractors that he contracts for the performance of work, and not be responsible for any Subcontractors that the Owner may contract with. The contractor shall supervise and direct the Work, using his best skills and attention, using standard tried and true construction practices, and he shall be solely responsible for all delegating and scheduling construction.

From August until December, 1992, the Klines refused to allow Mr. Benefiel and the subcontractors back into the house to make repairs. After negotiations between Benefiel's attorney and the Klines' attorney, the Klines agreed to allow Mr. Benefiel and the subcontractors to begin repairs. Repairs began on January 27, 1993, but very little work was accomplished. Mr. Benefiel states that the Klines frustrated the repairs by making demands as to the type of equipment that had to be used. The Klines objected to the type of drop cloth, flood lamp, and ladder used and insisted that Mr. Benefiel and the subcontractors leave the house until they obtained the proper equipment. The Klines assert that Mr. Benefiel was unprepared to make the repairs because he was aware of the equipment that they required him and the subcontractors to use. The Klines claim that Mr. Benefiel and the subcontractors failed to show up at scheduled times. Mrs. Kline also contends that Mr. Benefiel was angry and often yelled at her. Finally, on February 4, 1993, Mr. Benefiel and Mrs. Kline had a confrontation. Mr. Benefiel claims that Mrs. Kline grabbed for and wrestled him for his tape recorder. Mrs. Kline denies this occurred. Mr. Benefiel and the subcontractors left the house and never went back. The Klines' attorney stated that the work could not proceed unless Mr. Benefiel agreed not to visit the house except when Mr. Kline was present. Mr. Benefiel's attorney wrote letters to the Klines' attorney as to when Mr. Benefiel could continue the repairs, provided Mrs. Kline would not be present. Mr. Benefiel's attorney received no response from these letters.

The Klines hired a general contractor, Jerry Cobb ("Mr. Cobb"), to place a monetary amount on the defects identified in Mr. Merritt's report. Mr. Cobb reported the cost to correct the defects to be $34,200.00 as of April 17, 1993. The Klines later requested Mr. Cobb to update the cost for inflation. On March 31, 1998, Mr. Cobb reported the cost to be $45,476.00 due to an increase in costs and a shortage of labor. Mr. Benefiel argues that the measure of damages should be the cost at the time the defects should have been repaired.

Benefiel's attorney hired a general contractor, Phillip Bryce ("Mr. Bryce"), to place a monetary amount on the defects identified in Mr. Merritt's report. Mr. Bryce reported the cost to correct the defects to be $2,570.00. This amount did not include the cost to repair the Mexican tile. The Klines argue that this amount should not be accepted because Mr. Benefiel was attempting to change Mr. Merritt's report by hiring Mr. Bryce to determine what repairs were needed. Mr. Benefiel contends that Mr. Bryce did not make determinations as to what repairs were needed but simply placed a monetary amount on the defects. Mr. Bryce stated that part of his responsibility was to determine which repairs were needed.

On January 18, 1994, the Klines filed their initial complaint against Benefiel, alleging breach of contract and seeking compensatory damages and attorney's fees. Benefiel filed a counter-complaint on May 10, 1994, alleging breach of contract and unjust enrichment. In April, 1997, the Klines filed an amended complaint, alleging, in addition to the initial complaint, violations of the Tennessee Consumer Protection Act and seeking treble damages. The trial on the amended complaint was held on April 15, 1998. The trial court entered judgment in favor of Benefiel.[4] The trial court noted that the testimony of the witnesses was highly controverted which required the trial

---

[4]The trial court dismissed Benefiel's counter-complaint by order entered May 22, 2000.

court to weigh the relative credibility of the witnesses. The trial court found that (1) the advertisement brochure was violative of the Tennessee Consumer Protection Act, but the Klines suffered no damage as a result; (2) the reasonable cost to repair the defects as determined by the arbiter was $2,570.00; (3) Benefiel was not responsible for any defects concerning the Mexican tile because the Klines directly contracted for the Mexican tile; and (4) the Klines failed to mitigate their damages. This appeal followed.

## II. Standard of Review

The standard of review for a non-jury case is *de novo* upon the record. See Wright v. City of Knoxville, 898 S.W.2d 177, 181 (Tenn. 1995). There is a presumption of correctness as to the trial court's factual findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. Rule 13(d). For issues of law, the standard of review is *de novo*, with no presumption of correctness. See Ridings v. Ralph M. Parsons Co., 914 S.W.2d 79, 80 (Tenn. 1996).

## III. Law and Analysis

The Klines raise the following issues on appeal for our review:
1. Whether the trial court erred in finding that Mr. Benefiel was more credible than the Klines after concluding that Benefiel's brochure was false, misleading, and violative of the Tennessee Consumer Protection Act.
2. Whether the trial court erred in finding that the Mexican tile subcontractor contracted with the Klines rather than Benefiel.
3. Whether the trial court erred in concluding that the Klines' damages were not caused by Benefiel.
4. Whether the trial court erred in allowing the testimony of Benefiel's expert, Mr. Bryce.
5. Whether the trial court erred in finding that the Klines failed to mitigate their damages.
6. Whether the trial court erred in failing to award attorney's fees.
We will examine each of these issues in turn.

### Credibility and the Advertisement Brochure

The first issue presented for our review is whether the trial court erred in finding that Mr. Benefiel was more credible than the Klines after concluding that Benefiel's brochure was false, misleading, and violative of the Tennessee Consumer Protection Act. The trial court noted in its order that there were conflicts in the testimony of the witnesses. The trial court stated that, as a result, it weighed the relative credibility of the witnesses. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than the appellate court to decide those issues. McCaleb v. Saturn Corp., 910 S.W.2d 412, 415 (Tenn. 1995); Whitaker v. Whitaker, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). "[A]ppellate courts will not re-evaluate

a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." Wells v. Tennessee Bd. of Regents, 9 S.W.3d 779, 783 (Tenn. 1999).

The Klines argue that Mr. Benefiel was the least credible of all the witnesses because the trial court found that he distributed false and misleading advertisement brochures. The trial court found, however, that the Klines' damages were not caused by Mr. Benefiel's advertisement brochures. After taking into account the facts surrounding the advertisement brochure, the trial court still found Mr. Benefiel to be a more credible witness than the Klines. In determining the relative credibility of the witnesses, the trial court stated that it "assessed their manner and demeanor on the witness stand, the consistency of their statements, and the lucidity of their positions" in arriving at its findings and conclusions. After a review of the record, we are unable to find evidence sufficient to disturb the trial court's findings of credibility. The trial court found Mr. Benefiel's testimony to be more credible than the Klines' testimony, and we adhere to that assessment due to the absence of clear and convincing proof to the contrary.

## Mexican Tile

The second issue presented for our review is whether the trial court erred in finding that the Mexican tile subcontractor contracted with the Klines rather than Benefiel. The trial court found that Benefiel was not responsible for the cost of repair of the Mexican tile because the Klines directly contracted with the Mexican tile subcontractor. The testimony at trial was undisputed that Mrs. Kline contacted Mr. Lynn about installing tile in the house after she rejected Mr. Benefiel's suggestion for a Mexican tile subcontractor. The testimony at trial was controverted, however, as to whether the Klines or Benefiel directly contracted with the Mexican tile subcontractor. Mr. Benefiel claims that he did not speak to Mr. Lynn before the Mexican tile work began. Mr. Lynn testified that when Mrs. Kline first contacted him about installing tile he did not know Mr. Benefiel was involved in the job. The Klines point to the fact that Lynn & Adams submitted the bills for the Mexican tile to Mr. Benefiel who submitted them to the Klines for payment. The Klines also claim that since Mr. Benefiel stated he was responsible for supervising the Mexican tile work that he directly contracted with the Mexican tile subcontractor. Mr. Benefiel asserts he did not realize under the contract that he did not have supervisory responsibility over subcontractors with whom the Klines directly contracted. The trial court stated that because the testimony of the witnesses was highly controverted, it weighed the relative credibility of the witnesses in arriving at its findings and conclusions. As stated above, the trial court found Mr. Benefiel to be a more credible witness than the Klines, and without clear and convincing evidence to the contrary, we decline to disturb the trial court's findings as to credibility. Our review of the record, taking into account the trial court's determination of the credibility of the witnesses, leads us to conclude the evidence does not preponderate against the trial court's finding that the Klines directly contracted with the Mexican tile subcontractor.

## Damages

The third issue presented for our review is whether the trial court erred in concluding that the Klines' damages were not caused by Benefiel. The trial court found that the Klines were not damaged as a result of the advertisement brochure. The trial court stated that the defects in the house were not of a nature requiring the expertise of an engineer. The testimony at trial was controverted as to whether the Klines relied upon Mr. Benefiel's representations in entering into the contract. The Klines argue that they relied upon Mr. Benefiel's representations that he was an engineer, they were induced to sign the contract because of the representations, and they would not have contracted with Mr. Benefiel had they known the representations were false. The Klines claim that, in addition to the advertisement brochure, Mr. Benefiel orally represented to them that he was an engineer and could handle their structural concerns. Mr. Benefiel denies that he made such oral representations to the Klines. He claims that he never discussed with the Klines whether he was an engineer. Mr. Benefiel asserts that his wife told Mrs. Kline that he was not an engineer. Mrs. Kline denies this conversation took place. The trial court stated that because the testimony of the witnesses was highly controverted, it weighed the relative credibility of the witnesses in arriving at its findings and conclusions. Again, the trial court found Mr. Benefiel to be a more credible witness than the Klines, and without clear and convincing evidence to the contrary we decline to disturb the trial court's findings as to credibility. Our review of the record, taking into account the trial court's determination of the credibility of the witnesses, leads us to conclude the evidence does not preponderate against the trial court's finding that the Klines' damages were not caused by Benefiel.

## Testimony of Benefiel's Expert, Mr. Bryce

The fourth issue presented for our review is whether the trial court erred in allowing the testimony of Benefiel's expert, Mr. Bryce, for two reasons: (1) Mr. Bryce's testimony was based on inadmissible hearsay; and (2) Mr. Bryce's testimony and report sought to alter the findings of Mr. Merritt's report in violation of section six of the contract. We examine each of these arguments in turn.

Mr. Bryce testified at the trial that he consulted with a subcontractor to ascertain the cost to correct drywall defects. The Klines argue that the trial court erred in allowing Mr. Bryce's testimony because this was inadmissible hearsay. We disagree. Under evidentiary rule 703, "an expert witness may base an opinion upon clearly inadmissible hearsay, if the type of hearsay is one that would be reasonably relied upon by experts in that situation." State v. Kennedy, 7 S.W.3d 58, 66 (Tenn. Crim. App. 1999) (citing Tenn. R. Evid. 703).[5] Clearly, the trial court considered Mr. Bryce to be an expert

---

[5]Rule 703 states:

> Bases of opinion testimony by experts – The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall

(continued...)

witness. The trial court referred to Mr. Bryce as "[t]he defendant's expert contractor." Under rule 703, it was permissible for the trial court to allow such testimony if this matter was of a type reasonably relied upon by other experts in that same field. We find that Mr. Bryce's reliance on a drywall subcontractor's knowledge as to the cost to correct drywall defects was a matter of the type reasonably relied upon by other general contractor experts. Thus, Mr. Bryce's testimony was admissible under rule 703.

The Klines also argue that the trial court erred in allowing Mr. Bryce's testimony because the testimony sought to alter the findings of Mr. Merritt's report in direct violation of section six of the contract. Decisions regarding the admission or exclusion of expert testimony are discretionary. See McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263 (Tenn. 1997); Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C., 813 S.W.2d 400, 406-07 (Tenn. 1991); Smith County v. Eatherly, 820 S.W.2d 366, 368 (Tenn. Ct. App. 1991). Accordingly, we will not overturn a trial court's decision either to admit or to exclude expert testimony unless it was arbitrary or an abuse of discretion. See Buchanan v. Harris, 902 S.W.2d 941, 945 (Tenn. Ct. App. 1995). "An abuse of discretion exists when the reviewing court is firmly convinced that the lower court has made a mistake in that it affirmatively appears that the lower court's decision has no basis in law or in fact and is therefore arbitrary, illogical, or unconscionable." State v. Brown & Williamson Tobacco Corp., 18 S.W.3d 186, 191 (Tenn. 2000) (citing Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)).

Mr. Merritt's report set out the defects in the Klines' house but did not make findings as to the cost to repair the defects. The trial court allowed expert testimony from the Klines' witness, Mr. Cobb, as to the cost to repair the defects. Over the Klines' objection, the trial court allowed testimony from Benefiel's witness, Mr. Bryce, on the specific issue of the cost to repair the defects. The trial court then had the opportunity to assess the relative credibility of both expert witnesses and determine which expert's findings to adopt after taking into consideration all the evidence. We find it was neither arbitrary nor an abuse of the trial court's discretion to allow expert testimony from Mr. Bryce on the cost to repair the defects.

### Mitigation of Damages

The fifth issue presented for our review is whether the trial court erred in finding that the Klines failed to mitigate their damages. The doctrine of mitigation of damages imposes upon an injured party a duty to exercise reasonable care and diligence in attempting to avoid loss or minimize damages after an injury has been inflicted. See Cook & Nichols, Inc. v. Peat, Marwick, Mitchell &

---

[5](...continued)
> disallow testimony in the form of an opinion or inference if the
> underlying facts or data indicate lack of trustworthiness.
Tenn. R. Evid. 703.

Co., 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971); Gilson v. Gillia, 321 S.W.2d 855, 865 (Tenn. Ct. App. 1958). To the extent that an injured party fails to exercise reasonable care and diligence, he cannot recover his damages. See id. "The critical factor in determining fulfillment of a plaintiff's duty to mitigate is whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time." Action Ads, Inc. v. William B. Tanner Co., Inc., 592 S.W.2d 572, 575 (Tenn. Ct. App. 1979) (quoting Tampa Electric Co. v. Nashville Coal Co., 214 F. Supp. 647, 652 (M.D. Tenn. 1963)). An injured party is not required to mitigate damages if this would be unduly burdensome or impossible. See Cummins v. Brodie, 667 S.W.2d 759, 766 (Tenn. Ct. App. 1983).

The trial court found that Mr. Benefiel was willing to make repairs on the house, but the Klines' conduct was "unreasonable and unnecessary, and prevented the defendant from effectuating these repairs." The trial court further found that the Klines would have suffered no damages had they allowed Mr. Benefiel the opportunity to make the necessary repairs. The trial court denied any recovery to the Klines for the cost to repair the defects due to the failure to mitigate their damages.

Both the Klines and Mr. Benefiel testified that from August until December, 1992, the Klines refused to allow Mr. Benefiel or the subcontractors into the house to make repairs. After negotiations between the Klines' attorney and Benefiel's attorney, the Klines agreed to allow Mr. Benefiel and the subcontractors to begin repairs. The testimony of the Klines and Mr. Benefiel was controverted concerning the events that occurred once the repair work began. The Klines claim that Mr. Benefiel and the subcontractors failed to show up to work at scheduled times. Mr. Benefiel asserts that the Klines frustrated the repairs by making unreasonable demands as to the type of equipment that had to be used. Mr. Benefiel states that the Klines insisted that the subcontractors leave the house until they obtained the proper equipment. The Klines argue that Mr. Benefiel was unprepared to make the repairs because he was aware of the equipment that they required him and the subcontractors to use. After a confrontation between Mrs. Kline and Mr. Benefiel, the Klines refused to allow Mr. Benefiel in the house unless Mr. Kline was present. Benefiel's attorney stated that he made efforts to contact the Klines' attorney as to when Mr. Benefiel could continue the repairs, provided Mrs. Kline would not be present. Benefiel's attorney claimed he received no response from the Klines' attorney.

The Klines argue that the case at hand is controlled by Salley v. Pickney Co., 852 S.W.2d 240 (Tenn. Ct. App. 1992). In Salley, the complaint arose out of a contract entered into by the plaintiffs ("the Salleys") and the defendants ("Contractors") whereby the Contractors agreed to raise the Salleys' house. The trial court dismissed the Salleys' complaint for failure to mitigate their damages. The Salleys appealed. The court of appeals reversed, finding that the Salleys acted reasonably under the circumstances in refusing to allow the Contractors to come back into their house to make repairs. See id. at 244. The court found that the Salleys could not be found to have failed to mitigate their damages. See id. at 244-45. In making its determination, the court noted the defects in the Contractors' "unworkmanlike performance." See id. at 244. The Klines argue that they cannot be found to have failed to mitigate their damages after they refused to allow Mr. Benefiel and the

subcontractors back into the house to make repairs. The Klines assert that there were a number of defects in Benefiel's work just as in the Contractors' work in <u>Salley</u>.

We find that <u>Salley</u> is readily distinguishable from the case under consideration. The Salleys alleged numerous violations in their complaint against the Contractors, including: (1) failing to hire qualified and experienced workers; (2) failing to obtain necessary permits for plumbing and electrical work; (3) failing to utilize licensed plumbers and electricians; and (4) violating building regulations. <u>See id.</u> at 241. In addition, the court of appeals cited evidence demonstrating the Contractors' unworkmanlike performance, including (1) raising the house one end at a time which was not done by any other contractors in the area; (2) failing to construct the floor and walls of a room so that the floor and wall met; (3) dumping the remains of a pre-existing concrete porch next to the house and covering this over rather than hauling off the remains as required in the contract; (4) tearing the brick off the exterior of the home in the darkness and doing so in a careless and reckless manner as to pull the cable television connection through the exterior wall and rip it from the cable tuner box; and (5) rupturing a waterline by breaking off an exterior water faucet. <u>See id.</u> at 244-45. By contrast, the trial court in the case at hand stated that "with the exception of the tile, the patio and the sheetrock, and other minor matters, this construction was workmanlike and satisfactory." The trial court further found that Benefiel was not responsible for the defects in constructing the Mexican tile. The defects in <u>Salley</u> were much more egregious than any of the defects contemplated in the case at hand, such as misplaced light switches or a lack of handles on cabinet doors in a bookcase. Due to the factual distinction between <u>Salley</u> and the case at hand, we find the holding in <u>Salley</u> is not controlling in this case.

The trial court stated that because the testimony of the witnesses was highly controverted, it weighed the relative credibility of the witnesses in arriving at its findings and conclusions. As stated above, the trial court found Mr. Benefiel to be a more credible witness than the Klines, and without clear and convincing evidence to the contrary, we decline to disturb the trial court's findings as to credibility. Our review of the record, taking into account the trial court's determination of the credibility of the witnesses, leads us to conclude the evidence does not preponderate against the trial court's finding that the Klines failed to mitigate their damages.

**Attorney's Fees**

The sixth issue presented for our review is whether the trial court erred in failing to award attorney's fees under the Tennessee Consumer Protection Act pursuant to section 47-18-109 of the Tennessee Code. Section 47-18-109(e)(1) states, "Upon a finding by the court that a provision of this part has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs." Tenn. Code Ann. § 47-18-109(e)(1) (1995). The trial court found that Benefiel's advertisement brochure was "false and misleading, violative of the Consumer Protection Act." The Consumer Protection Act limits recovery to "any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use of or employment by another person of an unfair or deceptive

act or practice . . . ." Tenn. Code Ann. § 47-18-109(a)(1). The trial court found that the Klines suffered no ascertainable loss as a result of the advertisement brochure so that the Consumer Protection Act had no application. Because the trial court found that the Klines were ineligible to recover under the Consumer Protection Act, the trial court acted appropriately in failing to award attorney's fees under the Consumer Protection Act. Nevertheless, even if the Klines were eligible to recover under the Consumer Protection Act, the trial court is vested with broad discretion in the allowance of attorney's fees. See Haverlah v. Memphis Aviation, Inc., 674 S.W.2d 297, 306 (Tenn. Ct. App. 1984). We find nothing in the record to indicate that the trial court abused its discretion.

## IV. Conclusion

For the foregoing reasons, the decision of the trial court is affirmed. Costs of this appeal are taxed against the Appellants, Stanley J. Kline and Sandra C. Kline, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE