IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 24, 2004

## VACCARO CONSTRUCTION CO., INC. v. LOUIS L. SCHAFER AND C. MARIE SCHAFER

**An Appeal from the Chancery Court for Shelby County
No. 98-0133-2     Arnold Goldin, Chancellor**

_____

**No. W2003-02515-COA-R3-CV - Filed October 28, 2004**

_____

This is a construction case. The defendant homeowners had an oral contract with the plaintiff contractor to perform renovations on their home. After problems with the renovations arose, including flooding of the home after a rainstorm, the homeowners terminated the contractor. The contractor filed a claim seeking enforcement of a lien on the improved property or payment for the work done on theories of breach of contract, quantum meruit, and unjust enrichment. The homeowners counter-claimed that the contractor owed them for the cost of repairing the contractor's defective work. After a bench trial, the trial court found that the contractor's work fell well below the applicable standard and awarded the homeowners damages for the repair of the contractor's defective work. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

James Stephen King, Memphis, Tennessee, for the Appellant, Vaccaro Construction Co., Inc.

Shea Sisk Wellford, Memphis, Tennessee, for the Appellees, Louis L. Schafer and C. Marie Schafer.

**OPINION**

In 1997, Defendants/Appellees Louis and Marie Schafer ("the Schafers") sought a contractor to do extensive renovations on their home. They hired Plaintiff/Appellant Vaccaro Construction Co., Inc. ("Vaccaro"), whose president is Tony Vaccaro ("Mr. Vaccaro"), a licensed contractor. In late spring or early summer 1997, Vaccaro gave the Schafers a fixed-price proposal to do the renovations they wanted. The price exceeded the Schafers' budget. Vaccaro and the Schafers then reached an oral agreement whereby Vaccaro agreed to do the renovations on its cost plus an agreed-upon percentage for profit, and Mr. Schafer, who had done some construction in the past, would do some

of the renovations himself. Vaccaro was to provide the Schafers with a detailed breakdown of its costs, overhead and profit. The parties had no written agreement. Vaccaro began work on the Schafers' home in late June 1997.

Vaccaro commenced renovations on several areas of the Schafers' home. Vaccaro's crew was supervised by Dale Gatlin, the crew foreman. Mr. Vaccaro was seldom present on the job. As the work progressed, Mr. Schafer expressed increasing concern about various aspects of Vaccaro's work, including undersized headers and liners on the third floor, a third floor deck which sloped in the wrong direction, walls out of plumb, and difficulties in cutting rafters to match the existing roof line. The Schafers had concerns about other issues as well. In one incident, Vaccaro rented a backhoe, used it for a short time, and then let it sit nearly a full day before returning it, thereby incurring needless rental costs. In other incidents, Vaccaro's crew borrowed Mr. Schafer's trailer and negligently damaged it, and accidentally cut buried electrical cables because they failed to notify the utility company they would be digging.

The final incident occurred the night of August 8, 1997. Mrs. Schafer was in town,[1] but her husband was out of town. A heavy rain fell that night and water rained into the house from various places where Vaccaro had begun the renovations. Most of the Schafers' home was essentially flooded, with water coming in the upstairs skylight, openings in the roof and through light fixtures and electrical outlets. When Mr. Schafer returned from out of town and saw the water damage, he telephoned Mr. Vaccaro and terminated Vaccaro's services.

The Schafers then employed a general contracting company, MMR Group, which was owned and operated by Dan Cline and Barry Cummings. MMR Group was hired to remedy the water damage caused by the flooding, rectify Vaccaro's defective work, and also to finish the renovations.

Within ten days after the flooding incident, Vaccaro sent the Schafers an invoice for $31,965.39 for Vaccaro's work. A second invoice for $1,316.06 was sent later. The Schafers paid Vaccaro $20,000.

On February 12, 1998, Vaccaro filed the instant lawsuit against the Schafers, alleging that the Schafers owed Vaccaro the remaining $13,282.45 which was invoiced to the Schafers but not paid. The Schafers responded with a counterclaim, seeking damages for the cost of rectifying Vaccaro's defective work and for remedying problems caused by Vaccaro, including the water damage from the August 8, 1997 flooding. A bench trial was held on August 25, 2003.

At trial, Mr. Vaccaro testified on behalf of Vaccaro. In response, both Mr. and Mrs. Schafer testified, as well as Dan Cline and Barry Cummings, both owners of MMR Group, and Richard Threlkeld, a framing contractor employed by MMR Group to work on the Schafers' home.

---

[1]The Schafers had rented another place to live during the renovations.

Mr. Vaccaro testified that when he began work on the Schafers' home, he was working on other projects as well. Mr. Vaccaro described generally the renovations that were to be done, from the original plans and drawings. Mr. Vaccaro said that, up to the date he was terminated, he built in accordance with the plans. He noted that one of the Schafers was at the job site nearly every day, and that Mr. Schafer pulled the building permit on the job. Mr. Vaccaro asserted that the original construction on the Schafers' home was poorly done, and that this created problems for him in doing the renovations.

Mr. Vaccaro was asked on direct examination about various problems with the construction that had been identified in the Schafers' discovery responses. As to a joist in the dining room that was purportedly running in the wrong direction, Mr. Vaccaro said the joists were running in a "certain" direction, and if one joist was not running in the correct direction, it "was probably used for bracing purposes." Mr. Vaccaro acknowledged that the liners on the windows in the study area were "incorrect" and implied that this was due to a change in the "code." He asserted that required earthquake straps were on the job site but had not yet been installed. In response to the assertion that the garage door header was incorrect in that it had "two by twelves instead of a beam," Mr. Vaccaro said to his knowledge this was not a violation of the code, but indicated that "just" the headers were "wrong."

Mr. Vaccaro was asked about the slope on the deck causing water to flow toward the house instead of away from the house. He said that they "were calling out a waterproofer" to address it, but the waterproofer had not yet arrived as of the date he was terminated. When asked about the Schafers' assertion that "the workshop and exterior band on the tin band was incorrectly applied causing the deck to bow up," Mr. Vaccaro responded that he was unsure about it. When questioned about whether window heights were set wrong, Mr. Vaccaro replied that he was "not aware of that, but the windows had to be tore out anyway because of the liner situation" that he had previously admitted. Mr. Vaccaro was asked about the Schafers' allegation that in the office and master bedroom the roof was framed incorrectly and the pitch of the roof was different on all four sides. His response was that the room size was enlarged "which threw everything off just a little bit." Mr. Vaccaro was unsure about an allegation that a beam was improperly notched, saying that the beam "was probably notched for a reason."

Mr. Vaccaro also testified about the incident which finally led to his termination, in his words, "the day that this supposed monsoon rain hit. . . ." Mr. Vaccaro said that prior to the rain, he had had discussions with the Schafers in which he "had offered to dry the house in" and keep water out by using felt and cheap shingles until the roof was completed, but that the Schafers did not want that expense. At the time the rain came, Mr. Vaccaro said, they had put up new boards and joists, and plywood with roof felt over it. He testified:

> And I know we put something over it because we wouldn't just let it leak, but what I don't recall. I think it was probably just felt actually, but it wasn't a hole. . . .
>      I think we had plastic over it, too. I'm not really sure.

Mr. Vaccaro acknowledged that he did not go to the Schafers' house the day of the rain, or the day after.

On cross-examination, Mr. Vaccaro admitted that he was not present during the Schafers' renovations as he normally had been on past projects. He acknowledged that the construction was not "up to my standard." Mr. Vaccaro explained this by asserting that he "was told that Mr. Schafer was going to be the supervisor on the project. He pulled the permit. He was the general contractor of record for the project. And . . . he wanted to save money on the supervision." Mr. Vaccaro complained repeatedly that he was not given the opportunity to fix problems and correct defective work. Vaccaro presented no other witness.

Mr. Schafer testified on his own behalf, outlining the numerous problems with Vaccaro's work. He described, for example, a beam notched on the bottom, "which made it instead of a 16 inch beam, an 8 inch beam for all practical purposes." It was later resolved by putting in a closet downstairs that was not planned, in order to put a wall under that beam for support. Mr. Schafer became especially concerned when he saw three of Vaccaro's employees trying for several hours to "figure out how to cut a rafter for this roof. And there's three there . . . on an hourly rate. Couldn't figure out how to cut or to either draw the proper angle for the rafter." Mr. Schafer said that Mr. Vaccaro was rarely on the construction site. After Mr. Schafer had developed significant concerns about Vaccaro's workmanship, the rainstorm of August 8, 1997 occurred. Mr. Schafer was out of town that evening, and received a distressed telephone call from his wife that rainwater had come in the skylight and the roof, as well as through light fixtures and electrical outlets, with water standing in the ground floor and the basement of the house. A friend put plastic on the roof to try to prevent further damage. When Mr. Schafer got back in town, he left Vaccaro a telephone message, and spoke to Mr. Vaccaro by telephone a few days after the rain. Mr. Schafer described the damage to Mr. Vaccaro, since Mr. Vaccaro had not been to the Schafers' home to see it. Mr. Schafer testified that he told Mr. Vaccaro that he was not happy with Vaccaro's workmanship, and that Mr. Vaccaro acknowledged "things weren't going well" and told Mr. Schafer that "it would probably be better that we did go our separate ways and he move on." Mr. Schafer said that Vaccaro did not ask for an opportunity to fix the problems with the Schafers' home.

Mr. Schafer testified that, after the rainstorm incident, he hired MMR Group ("MMR") to repair the damage from the flooding as well as the defects in Vaccaro's workmanship, and to complete the renovations to the house. The repair of the flooding damage and the correction of the problems with Vaccaro's work were invoiced separately from MMR's work on the new construction. In addition, Mr. Schafer did some of the repair work himself, and kept track of his costs and time. Mr. Schafer outlined his costs for remedying the flooding damage and Vaccaro's defective work, and also testified about expenses sought by Vaccaro that he considered excessive or unwarranted. Mr. Schafer acknowledged that he did not give Vaccaro a list of the construction defects until after the had hired an attorney and that, had Vaccaro asked for the opportunity to cure the defects, in light of his opinion of Vaccaro's workmanship, he would not have let him come back to fix the defects. Mrs. Schafer testified as well, primarily about the extensive flooding that occurred at the home the night of August 8, 1997, while her husband was out of town. She asserted that the "whole house"

was flooded, the second floor, the first floor and the basement, and identified as exhibits numerous photographs of the flooding.

The Schafers proffered testimony from Dan Cline and Barry Cummings with MMR, as well as MMR's subcontractor, Richard Threlkeld. Cline detailed the areas in which Vaccaro's construction was below the applicable standard for such work, and the repairs needed to correct the defects. After they stabilized the house from the flooding, Cline testified, they had a code inspector come to the house to inspect and verify the list of repairs needed to bring the house up to code. MMR then worked from that list.

Cline testified that, in the first floor storage room, the walls were out of plumb and the headers had to be replaced, and existing plywood had to be removed in order to make the repairs. In another area, double liners and new windows had to be installed, with extensive dismantling needed in order to do so.

Cline noted the notched beam discussed by Mr. Schafer in his testimony. Cline testified about a photograph of it:

> The glu-lam beam that was notched to go on top of the all. The proper method would be to notch the wall, not the beam. And they – they tried to correct this method by putting a temporary brace underneath there. It was supposed to be just a straight wall.
>
> So what we had to do is to jack it up to get the wall level or the ceiling level. We also had to support underneath the glu-lam, and what we ended up doing was building a small closet underneath that corner to carry the weight of the glu-lam.

Cline described joists that needed to be replaced and a photograph of the deck, an area in which the water was directed toward the house instead of away from the house:

> And what happened the concrete was out of level, and the wall there was out of level, and everything on that corner was going out of level. And then as you can see, this is going downhill. And this looks like it is going back towards the house. The water was going towards the house instead of away from the house.

Cline also described the area in which Mr. Schafer had testified that Vaccaro's employees spent an inordinate amount of time trying to cut roof rafters to end up with the correct pitch. Cline said that, after virtually replacing the entire roof on the addition, the new roof ended up tying in with the same pitch as the original roof. Cline said that the skylight in the master bath was not waterproofed, so when it rained, water entered through the skylight and went all the way down to the garage. This had to be redone, and hurricane clips put in instead of pressure blocks, which were

no longer permitted under the applicable code. Cline described other areas in which headers were undersized, liners had to be replaced, gables were out of plumb, joists were running in the wrong direction, and floors had to be jacked up.

Cummings testified that he came to the Schafers' house after the August 8, 1997 flooding. He said that the house was "covered in water" when he arrived. Cummings explained that Vaccaro had been working in a number of areas of the house at once, and these areas were only "partially dried in," that is, only partially weatherproofed. Cummings explained the proper method to protect against the type of water damage that occurred at the Schafers' house:

> The way that we do it is when we open an area of a home up for renovation, that is the area that we concentrate on until it is weather proofed – not weather proofed until it is dried in for that day. We don't leave the job until the area that we have opened up is dried in.

Cummings said that Vaccaro fell below the industry standard in protecting the Schafers' house from water damage. Cummings also corroborated Mr. Schafer's testimony that many of the expenses claimed by Vaccaro were not customary in the industry, more excessive or were otherwise improper.

Threlkeld, MMR's subcontractor, testified primarily about the work he and his crew did to correct Vaccaro's defective work and remedy the water damage. In waterproofing the Schafers' house, Threlkeld said, he saw that Vaccaro had put felt paper on the roof. In doing so, instead of "lapping" the paper in a manner to shed water, Vaccaro had lapped the paper improperly so that water was directed inside the house. In doing his work, Threlkeld testified, he kept a log book of work done to remedy defective work, separating it from the new construction.

At the conclusion of the testimony, the trial court issued an oral ruling, finding that Vaccaro's work was not done properly, and that Vaccaro failed to properly protect the house from water damage. After the rainstorm incident, the trial court concluded, the Schafers were justified in not wanting Vaccaro back on the job. The trial court found that, as a result of Vaccaro's substandard work, the Schafers were required to go in and tear out Vaccaro's construction in order to repair the defects and the water damage. As a result, the trial court denied any damages to Vaccaro, disallowing a number of Vaccaro's claimed expenses, and awarded the Schafers a judgment in the amount of $17,706.39. From this judgment, Vaccaro now appeals.

On appeal, Vaccaro argues that the Schafers were not entitled to damages because they were required to give Vaccaro notice of the claimed defects and the opportunity to cure them. In addition, Vaccaro argues that the Schafers were improperly awarded damages for "repairing" construction that was not performed by Vaccaro.

Our review of this case is governed by Rule 13(d), Tennessee Rules of Appellate Procedure, which provides that review of a bench trial decision shall be *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the findings of fact, unless the evidence

preponderates otherwise. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

Mr. Vaccaro first argues that he should have been given notice of the defects and an opportunity to repair any defective work. In general, a party alleging breach in a contract case must make efforts "reasonable under the circumstances existing at the time" to mitigate the damages. *See Salley v. Pickney Co.*, 852 S.W.2d 240, 244 (Tenn. Ct. App. 1992) (quoting *Action Ads, Inc. v. William B. Tanner Co.*, 592 S.W.2d 572 (Tenn. Ct. App. 1979)). The injured party is required to mitigate by using a method that is reasonable under the circumstances. Where reasonable, this can include giving the party in breach of the contract notice of the claimed defects and an opportunity to cure. Where, however, the defects are extensive and the contractor's overall performance must be deemed unworkmanlike, the injured party may reasonably refuse to risk further injury by giving the contractor the opportunity to attempt to repair the defects. *Id.*

In this case, the Schafers clearly acted reasonably in hiring another contractor to repair Vaccaro's work. Even if Vaccaro had sought to repair the claimed defects, the Schafers could reasonably refuse Vaccaro that opportunity. In this case, within a relatively short period of time, Vaccaro managed to compile a stunning array of incidents of defective work, failing to even weatherproof their work to protect the house from the elements. We find no error in the trial court's holding on this issue.

Vaccaro also argues that the trial court erred in awarding the Schafers repair costs for defective construction when Vaccaro did not perform the defective construction. In particular, Vaccaro objects to being required to pay damages for the repair of the water damage to the Schafers' home. Vaccaro argues that the Schafers "refused to incur the expense involved in drying in the house. . . . [T]here would have been no water damages had the [Schafers] followed [Vaccaro's] advice and dried in the roof. [Vaccaro] cannot be held liable for damages caused by [the Schafers'] refusal to heed [Vaccaro's] advice."

This argument on appeal, while demonstrating considerable chutzpah, has no basis in either the law or the evidence at trial. If a party breaches a contract by inadequately performing, then he is liable for the repair of any damages caused by his inadequate performance. *Wilhite v. Brownsville Concrete Co., Inc.*, 798 S.W.2d 772 (Tenn. Ct. App. 1990); *Jessee's Estate v. White*, 633 S.W.2d 767 (Tenn. Ct. App. 1982). Thus, even if Vaccaro did not work directly on the damaged areas, such as a room on the ground floor that had not been renovated but was the subject of water damage, Vaccaro would be liable if the water damage resulted from Vaccaro's defective work.

In this case, the evidence is clear that Vaccaro had an obligation to dry in the house while it was under construction. The expert testimony proffered by the Schafers was undisputed and unequivocal that a contractor such as Vaccaro is obligated to make certain that the house is weatherproofed each day before they leave the job site. Cummings explained that this was normally accomplished by concentrating on a particular area of the home being renovated, and drying in the area under construction each day. In contrast, Vaccaro had "several areas" of the house open to the

-7-

elements, and these were only partially dried in.  In his testimony, Cummings maintained that it "is standard in the industry to operate so that you do not leave the house exposed to the elements," as Vaccaro did.

Mr. Vaccaro testified that he had proposed to Mr. Schafer that the house be dried in by using felt and "cheap shingles," and that the Schafers "didn't want to go to that expense."  Mr. Vaccaro did not testify that the Schafers chose not to have the house dried in, only that they did not want the expense of the temporary shingles.  Even Mr. Vaccaro acknowledged his obligation to be certain that the roof did not leak, saying, "and I know we put something over it because we wouldn't just let it leak, but what I don't recall."  Indeed, the evidence was clear that Vaccaro made some attempt to dry in the house, but did so poorly, lapping the roof felt in the wrong way so that water was funneled into the house, installing plywood improperly, leaving gaps in the roof, leaving a skylight exposed, and otherwise failing to adequately protect the house.  Vaccaro's argument is clearly without merit.

After reviewing the overall record, the evidence clearly supports the damages awarded to the Schafers.  We find no error in the judgment awarded against Vaccaro.

The decision of the trial court is affirmed, and costs are assessed to the Plaintiff/Appellant Vaccaro Construction Co., Inc., for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE