IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 3, 2020

## SOUTHEAST DIAMOND JUBILEE INVESTMENTS, LLC, AS SUCCESSOR TO KAWAL, INC., D/B/A GAS EXPRESS v. UMA SHIV, INC.

Appeal from the Circuit Court for Blount County
No. L-19777      David R. Duggan, Judge

_____

No. E2019-02141-COA-R3-CV
_____

In this action involving a commercial lease, the lessor corporation filed an unlawful detainer complaint in the Blount County General Sessions Court ("general sessions court") seeking termination of the lease and eviction of the lessee corporation, which operated a gas station on the leased premises. Following a bench trial, the general sessions court entered a judgment dismissing the complaint with prejudice. On appeal to the Blount County Circuit Court ("trial court"), the lessor filed an amended complaint alleging several breaches of contract by the lessee. Following a four-day bench trial, the trial court dismissed the lessor's complaint upon finding, *inter alia*, that the lessee had not materially breached the lease. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY W. ARMSTRONG, J., joined.

Melanie E. Davis, Maryville, Tennessee, for the appellant, Southeast Diamond Jubilee Investments, LLC, as successor to Kawal, Inc., d/b/a Gas Express.

Kevin C. Stevens and Elijah C. Lovingfoss, Knoxville, Tennessee, for the appellee, Uma Shiv, Inc.

## OPINION

### I. Factual and Procedural Background

The commercial lease giving rise to this action was entered into on April 4, 2013, between Kawal, Inc. ("Kawal"), d/b/a Gas Express, as the lessor and the defendant, Uma

Shiv, Inc. ("Uma Shiv"), as the lessee for a period of five years with three five-year options to renew the lease. Under the 2013 lease, Kawal, as represented by its proprietor, Aziz Jooma, leased a gas station and convenience store, known as Gas Express ("Gas Express"), to Uma Shiv, through its sole proprietor, Setu Kalariya.[1] Gas Express occupied the lower level of a two-story commercial building located at 4510 Airport Highway in Louisville, Tennessee ("the Property").

In May 2017, Johaina Poonawalla and Zaheer Poonawalla, sister and brother, purchased the Property from Kawal, Inc. Although the record demonstrates that the Poonawallas attempted to persuade Mr. Kalariya to enter into a revised lease in June 2017, it is undisputed that the Poonawallas and Mr. Kalariya never reached an agreement as to lease revisions and that the 2013 lease ("the Lease") continued to govern the lessor/lessee relationship. *See Hughes v. Donlon*, 261 S.W. 960, 965 (Tenn. 1924) (stating that when leased premised are sold, "the tenant cannot be deprived of his leasehold by such a sale"). In August 2017, the Poonawallas conveyed the Property via quitclaim deed to a corporation owned by them as fifty-fifty proprietors, Southeast Diamond Jubilee Investments, LLC ("Southeast Diamond"), which is the successor lessor and the plaintiff in the instant action.

On August 29, 2017, Southeast Diamond filed its unlawful detainer complaint in the general sessions court, asserting that Uma Shiv was in wrongful possession of Gas Express because it was in breach of contract as to the Lease. Alleging that Uma Shiv owed $12,600.00 in unpaid rent, Southeast Diamond requested possession of Gas Express and a money judgment for "(a) unpaid rent, (b) damages to the property, (c) attorney fees (if applicable), and (d) all litigation taxes and costs." Southeast Diamond subsequently filed a nearly identical complaint in the general sessions court on September 5, 2017, except that the second complaint contained no allegation of unpaid rent. In both complaints, Southeast Diamond stated that it had given Uma Shiv written notice to vacate Gas Express on August 1, 2017. Following a bench trial, the general sessions court, with Judge Robert L. Headrick presiding, entered a judgment on November 27, 2017, dismissing Southeast Diamond's claims with prejudice.

Upon appeal to and with permission from the trial court, Southeast Diamond filed an amended complaint on February 2, 2018. According to the amended complaint, Gas Express comprised the entire downstairs level of the two-story commercial building

---

[1] Mr. Kalariya acknowledged during trial that in signing documents related to Gas Express, he often used the name, Jimmy Patel. He stated that his legal name was Setu Kalariya, and we note that this is the name under which he executed the Lease. We also note that Mr. Kalariya's surname is sometimes spelled in the record as "Kalaria." Inasmuch as Mr. Kalariya has for the most part presented his name spelled with a "y" in his own pleadings and documents, we will employ this spelling throughout the opinion. No disrespect is intended.

located on the Property. The upstairs level contained five units, including an operational hair salon, three "formerly residential" units, and a vacant office space. Southeast Diamond alleged multiple material breaches of contract committed by Uma Shiv, including: (1) refusal to pay water bills, necessitating payment of the water bills by Southeast Diamond; (2) failure to pay "certain plumbing and electrical repair work" after demand for payment was made by Southeast Diamond; (3) violation of City of Alcoa codes; (4) violation of Tennessee Department of Environment and Conservation ("TDEC") regulations; (5) refusal to provide copies of TDEC reports to Southeast Diamond; (6) actions designed to "annoy and pester" the hair salon owner, including "maliciously turn[ing] off the water to the hair salon as a purposeful mischievous act"; and (7) attempts to "pester and annoy" Southeast Diamond by reporting nonexistent water leaks. Also alleging that the multiple breaches of contract violated the covenant of good faith and fair dealing, Southeast Diamond requested that Uma Shiv be ordered to vacate Gas Express and that the Lease be declared of no further effect. Southeast Diamond also requested an award of damages, reasonable attorney's fees, and costs.

Southeast Diamond attached multiple exhibits to its amended complaint, including, *inter alia*, the Lease, an asset purchase agreement executed simultaneously with the Lease, and notices of violations on the Property originating with the City of Alcoa ("the City") and TDEC. Under the Lease, the rent to be paid after the first year and up to the first optional five-year renewal period was $4,200.00 per month, which would then increase to $4,500.00 per month if the renewal option were exercised "for the entire Five (5) year term." Testimony during trial demonstrated that although the Poonawallas and Southeast Diamond had never directly accepted rent from Uma Shiv due to the Poonawallas' concern that such would be taken as a waiver of their claims, the rent had been deposited initially into the general sessions court by Uma Shiv and then into its counsel's trust account to be held for payment to Southeast Diamond. During trial, the trial court entered an agreed order releasing these funds to Southeast Diamond. As the trial court ultimately found in its final judgment, "there [was] no dispute in this case that [Uma Shiv had] paid its rent," nor was there any dispute that Uma Shiv had "exercised its option to renew for the first additional five (5)-year period."

In addition to the rent and renewal provisions, the Lease provided the following as pertinent on appeal:

4. Lessee agrees to use the Leased Premises in conformity with all municipal, county, State and Federal laws and regulations affecting Leased Premises and will save Lessor and its successors and assigns harmless from penalty, damage or charge for violation of any of said laws and regulations by Lessee.

3

5. Lessor, or its agents, successors, or assigns shall have the right to enter upon and inspect the Leased Premises at any and all reasonable times.

* * *

8. Lessee may not make alterations, decorations, or additional improvements on the Leased Premises without consent in writing of the Lessor of such alteration, decoration or improvement. Alterations and improvements made shall be the property of the Lessor and shall remain and be surrendered with the premises as a part thereof upon termination of the lease. Any damages resulting therefrom shall be repaired at the expense of the Lessee. Lessee shall be responsible for plumbing, electrical repair, and heat and air repair. Lessee shall also be responsible for the yearly tank renewal fees.

* * *

10. Lessee will pay for all charges for utilities consumed at or supplied to the Leased Premises.

* * *

12. All notices required or permitted by this Lease Agreement to be given by either party to the other shall be in writing and may be either personally delivered or sent by certified mail, properly addressed to the said party . . . .

13. In addition to any other rights and remedies to which Lessor may be entitled, if Lessee shall fail to pay the rent as herein provided, as and when the same shall become due and payable, or shall fail to keep or perform any of the covenants specified herein, and such rent or other default shall not be paid within ten (10) days in the case of money obligations after written notice to Lessee by Lessor, then this Lease Agreement, at the option of Lessor, shall be terminated and Lessor may take possession and shall be entitled to re-enter the Leased Premises, excluding Lessee therefrom and to hold the Leased Premises and re-lease the same. Lessee shall be responsible for all court costs, legal fees and other reasonable expenses incurred by Lessor in enforcing this provision.

14.    This Lease Agreement shall be binding upon the parties hereto and their respective successors, assigns and representatives.

15.    This Lease Agreement shall be interpreted under Tennessee Law.

16.    This Lease Agreement may be amended only by a writing executed by both parties hereto.

17.    Lessor shall be responsible for all property taxes on the leased premises.

Concerning the alleged violations of the City code and TDEC regulations at Gas Express and Southeast Diamond's efforts to terminate the Lease, it is helpful to organize the relevant information in the notices and letters attached to Southeast Diamond's amended complaint and/or subsequently introduced at trial according to the following timeline for those events that occurred subsequent to the Poonawallas' purchase of the Property:

June 29, 2017:    The Poonawallas' former counsel sent a letter to Uma Shiv's former counsel, giving a ten-day notice for Mr. Kalariya to sign the newly proposed lease agreement and "pay the full amount of the rent owed" or face eviction proceedings. The proposed lease agreement was fifteen pages in substantive length compared to the four-page original Lease and included, *inter alia*, a raise in monthly rent of $500.00 for each five-year optional renewal after the original execution; a "triple net" provision, which would have assigned responsibility for the real estate taxes, building insurance, and maintenance of the building to Uma Shiv; and some obligations concerning maintenance of the underground gasoline storage tanks specifically assigned to Uma Shiv that had not been expressly assigned to Uma Shiv in the original Lease.

July 3, 2017:    Uma Shiv's former counsel sent a letter to the Poonawallas' former counsel, stating that she had received the notice of termination of the lease and that such was unwarranted. She threatened legal action against the Poonawallas if they attempted to evict Uma Shiv.

July 6, 2017:    The Poonawallas' former counsel sent a second letter to Uma Shiv's former counsel, attaching an edited lease and "highlight[ing] the major issues" that the Poonawallas had with changes to the proposed

5

lease that had apparently been requested by Uma Shiv. This included a note stating that the Poonawallas desired that Uma Shiv, through Mr. Kalariya, would "be responsible for the maintenance and upkeep of the gas tanks and pumps, as he is the only one that will be running the station on a daily basis." Apart from proposed changes to the Lease, the Poonawallas' former counsel stated that the Poonawallas were "working with the appropriate agencies to get the property up to code, as currently it is not in compliance," necessitating repairs to electrical wire boxes, adding meters to separate tenants' water lines, replacing broken ceiling tiles, and relocating a water heater to keep "the agencies" from "shut[ting] down" Uma Shiv's business.

July 7, 2017: Uma Shiv's newly retained current counsel sent a letter to the Poonawallas' former counsel, informing her of his representation and stating that Uma Shiv had "no intention of signing a new lease agreement with Southeast [Diamond] on different terms than those set forth in the Lease." Uma Shiv's counsel also stated, *inter alia*, that "any attempt by Southeast to disrupt or otherwise interfere with Uma Shiv's business operations will be treated as a breach of Section 11 of the lease, and Uma Shiv will hold Southeast responsible for any damages caused thereby."

July 13, 2017: Gary Holloway, Building Official with the Planning and Codes Department for the City, sent a letter to Southeast Diamond, "Gas Express Uma Shiv, Inc.," and Mr. Kalariya, in care of the Poonawallas, giving notice that, pursuant to four site inspections performed at the Property in May and June of 2017, several conditions were "in violation of the listed codes." Mr. Holloway stated in the letter that the codes referenced were the "2012 International Property Maintenance Code, the International Building Code and NFPA [National Fire Protection Association] 1." While testifying during trial, Mr. Holloway marked these items as either "U" for upstairs or "T" for the tenant, meaning Uma Shiv's Gas Express facility. Excluding items concerning the upstairs units and administrative items, seven code violations concerned Gas Express. The code items violated at Gas Express related to proper installation and maintenance of the water supply system, proper installation and maintenance of mechanical appliances, defects to the electrical system, installation and maintenance of electrical wiring and

6

appliances, requirements for fire-resistance-rated construction, placement of combustible material, and storage of fueled equipment.

July 19, 2017:   Mr. Holloway sent a letter to "Gas Express Uma Shiv" and Mr. Kalariya, in care of the Poonawallas, after a site inspection that he conducted on July 18, 2017, setting forth the same seven code violations concerning Gas Express as in the July 13, 2017 letter.

July 20, 2017:   Paige Ottenfeld, an environmental specialist with the Division of Underground Storage Tanks at TDEC, sent a letter addressed to Aziz Jooma, as the proprietor of Kawal, giving notice of violations found in a compliance inspection performed at Gas Express on March 24, 2015, that had not been corrected as of the date of the notice. In the letter, Ms. Ottenfeld stated that if the violations were "not addressed in a timely manner, an Administrative Order [would] be issued and civil penalties [would] be assessed" in a total amount of $19,160.00. Ms. Ottenfeld further stated that if the administrative order were "allowed to go Final without resolution," TDEC would place the Property on the "Delivery Prohibition" list and "attach red tags to the fill ports of the underground storage tanks." The TDEC violations set forth in the July 20, 2017 letter concerned (1) the lack of designated Class A, B, or C operators; (2) the lack of monthly spill bucket logs for review by TDEC; (3) failure to maintain and provide for TDEC's review "Quarterly Dispenser Inspection Log" forms, reflecting inspection for "seeps and drips" with removal of the dispenser cover; (4) standing water found in contact with flex connectors in sumps for three tanks and a dispenser sump; and (5) missing or invalid monthly line leak results for three tanks over several months in 2014 and 2015.

July 21, 2017:   Counsel with the firm currently representing Southeast Diamond sent a letter to Uma Shiv's counsel, noting that it appeared that Uma Shiv "was not inclined to enter into a new lease agreement," and providing a "written notice of code violations that [had] recently come to [Southeast Diamond's] attention and which constitute[d] grounds for termination of [the Lease]." These violations purportedly included "multiple, persisting violations by Gas Express, which were cited [by TDEC] throughout most of calendar year 2015, particularly related to underground storage tanks and the Federal Energy Policy Act of 2005," as well as "a plethora of code violations at Gas Express" resulting from inspections conducted by the City in

7

May and June of 2017. Through counsel, Southeast Diamond alleged that Uma Shiv's "failure to comply with state, federal and local regulations . . . constitute[d] a breach of [the Lease]" and "grounds for termination." Counsel asserted that Southeast Diamond would "have no choice but to exercise its option to terminate" the Lease if the parties were "not able to agree on a specific plan to address these violations and amend the current lease agreement to more properly allocate risk between the parties."

August 1, 2017: Southeast Diamond's counsel sent a "Notice of Breach and Termination of Lease" to Uma Shiv's counsel, alleging continuing violations of City code and TDEC regulations as a breach of the Lease.

August 8, 2017: Uma Shiv's counsel sent a letter to Southeast Diamond's counsel, rejecting the notice of termination of the Lease and threatening legal action.

August 23, 2017: Uma Shiv's counsel sent a Notice of Exercise of Lease Option to Southeast Diamond's counsel.

August 25, 2017: Southeast Diamond's counsel sent a letter to Uma Shiv's counsel, attempting to refuse the lease option based on the notice of termination.

September 2017:[2] Attorney Shelly L. Wilson, representing the City, sent a letter to Southeast Diamond's counsel and Uma Shiv's counsel, giving a status update after an inspection performed at Gas Express by City officials on August 25, 2017. Ms. Wilson stated in pertinent part: "As of the time of the August 25 inspection, all municipal code violations identified by the City code officials during inspections held on May 26 and again on August 11, with a previous followup on August 23, have been corrected."

September 5, 2017: Jessica O. DeHope, an environmental scientist with the TDEC Division of Underground Storage Tanks, sent a letter to the Poonawallas, following an inspection of Gas Express that had been conducted on August 30, 2017. Ms. DeHope delineated the following violation that would result "in a future referral to the

---

[2] Ms. Wilson's letter was dated August 18, 2017. However, during trial, it was undisputed that this date was a typographical error on TDEC's part and that the letter was actually sent in September 2017.

enforcement section of the Division for review based on the severity of the violation."

Violation #1: Failure to provide a method, or combination of methods, of release detection for new or existing UST [underground storage tank] systems in accordance with Rule 0400-18-01-.04(1)(a). Specifically, at the time of inspection, release detection records were not available for Tank #1B (6,000 gallon gasoline) for September, November, and December 2016 and January, March, April, and July 2017 and for Tank #2A (4,000 gallon diesel) for May 2017 thru August 2017.

Ms. DeHope also set forth the following six violations found in August 2017 that she stated "can and shall be corrected":

Violation #2: Failure to report a change of status for a UST system within thirty (30) days in accordance with Rule 0400-18-01-.03(1)(g). Specifically, at the time of inspection, it was discovered that ownership of the referenced facility has changed.

Violation #3: Failure of facility having one or more petroleum UST systems to have one or more persons designated Class A, Class B, and Class C Operators in accordance with Rule 0400-18-01-.16(1)(a). Specifically, at the time of inspection, the facility did not have a designated Class A or Class B Operator.

Violation #4: Failure to train Class C Operators in emergency response procedures in accordance with Rule 0400-18-01-.16(2)(c). Specifically, at the time of inspection, signage or a manual indicating what to do in case of an emergency that is easily accessible to employees was not available for review.

Violation #5: Failure to install, calibrate, operate, or maintain a release detection method for tanks in accordance with Rule 0400-18-01-.04(1)(a)2. Specifically, at

9

the time of inspection, the Automatic Tank Gauge (ATG) printer was not working and could not print an ATG Programming Setup.

Violation #6:     Failure to provide a release detection method capable of detecting a release from a tank that routinely contains product in accordance with Rule 0400-18-01-.04(1)(a)1. Specifically, at the time of inspection, the Automatic Tank Gauge (ATG) setup printout was not available for review.

Violation #7:     Failure to install, calibrate, operate, or maintain a release detection method for piping in accordance with the manufacturer's instructions in accordance with Rule 0400-18-01-.04(1)(a)2. Specifically, at the time of inspection, the Line Tightness Test did not document the tester's certification number.

Ms. DeHope stated in this letter that because "significant operational compliance (SOC) violations were discovered during this inspection," TDEC "may conduct a follow-up inspection of only the noted SOC issues at a later date." She also stated, *inter alia*, that documentation of the violation corrections would have to be submitted to TDEC by October 5, 2017.

October 6, 2017:     Ms. DeHope sent a letter to the Poonawallas, informing them, *inter alia*, that sufficient responses to Violation numbers five, six, and seven, as set forth in her previous letter, had been received but that violations numbers one, two, three, and four had not been addressed. Ms. DeHope also informed the Poonawallas that upon their request, the deadline for submission of required documentation to correct the violations had been extended to November 6, 2017. Ms. DeHope advised that if the violations were "not addressed in a timely manner," Gas Express could be placed on the "Delivery Prohibition list" pursuant to "the UST [Underground Storage Tank] Act, as revised to comply with Section 1527 of the Federal Energy Policy Act of 2005."

November 9, 2017:     Ms. DeHope and Rhonda Key, an enforcement manager with TDEC, each respectively executed an affidavit setting forth the status of the seven violations found at Gas Express on August 30, 2017. Ms.

10

DeHope and Ms. Key each stated, *inter alia*, that Violation numbers one, two, and four had not been addressed; Violation number three was "a non-correctable violation that based on the severity will be referred for enforcement action"; and Violation numbers five, six, and seven had been corrected.

Follow-up Letter: Concerning the August 30, 2017 inspection, Robert E. Wilson, an environmental scientist with TDEC, sent a letter to Uma Shiv in care of Mr. Kalariya. The parties agreed during trial that the date on this letter, which was August 7, 2014, was a typographical error on TDEC's part. Mr. Wilson reiterated that Violation number one from the August 2017 inspection had been referred to enforcement with TDEC and that Violation numbers two, three, and four had not been corrected. Mr. Wilson set forth potential civil penalties for these violations in a total amount of $23,160.00 and a deadline of March 23, 2018, for all documentation of corrections to be submitted.

December 21, 2017: Southeast Diamond's counsel sent a letter to Uma Shiv's counsel, stating, *inter alia*, that documentation of Southeast Diamond's expenses for "numerous costs in attempting to get [Gas Express] up to Code" were included, referring to the City code violations.

February 15, 2018: Ms. DeHope sent a letter to Southeast Diamond, informing the Poonawallas that TDEC had received responses correcting violations numbers two (an indication in the change of ownership), five (documentation of the automatic tank gauge printer's repair), six (documentation of the automatic tank gauge programming set-up), and seven (documentation of an employee's certification to conduct line tightness testing). Ms. DeHope reiterated that Violation numbers one, three, and four still had not been addressed.

December 18, 2018: Stanley R. Boyd, Director with TDEC's Division of Underground Storage Tanks, sent an "Order and Assessment" issued by TDEC to Uma Shiv and Southeast Diamond, concerning what had been deemed violation number two, the failure to monitor underground storage tanks by providing monthly release detection records. TDEC assessed a civil penalty and referred Southeast Diamond and Uma Shiv to three options for resolving the penalty: (Option A) pay the full penalty of $12,800.00 within thirty-one days after receiving the Order; (Option B) pay twenty percent of the full penalty with the remaining eighty percent to be paid "if and only if, the Division

determines that a significant operational compliance violation has occurred at the facility during a one-year period to commence on the date of receipt of this Order"; or (Option C) submission of a signed "Request to Attend Underground Storage Tank Training" form within thirty-one days after receiving the order and completion of the training within one year after receiving the order, with payment of the civil penalty then due only if tank training were not successfully completed or "a significant operational compliance violation" were to occur at the facility during the year following receipt of the Order.

Mr. Kalariya successfully earned a "UST Operator Training Certificate" on November 14, 2018, with said certificate presented as an exhibit during trial. It is undisputed that by the time of trial, no penalty or fine had been assessed by TDEC or the City against either party to this action. It is also undisputed that by the time of trial, Southeast Diamond had successfully changed the owner designation of the Property and Gas Express with TDEC, and Mr. Kalariya had been successfully designated with TDEC as the Operator A, B for Gas Express with educational materials properly displayed for an employee designated as an Operator C. Therefore, by the time of trial, no violations lodged by the City or TDEC against Gas Express remained outstanding.

The dispute between the parties regarding the water utility at Gas Express involved Uma Shiv's payment of its share of the water utility over time as well as Southeast Diamond's allegations that Mr. Kalariya had purposefully shut off the water to the entire building on the Property out of anger. During trial, Mr. Kalariya acknowledged that during the summer of 2017, he had turned off the water to the entire building twice due to what he asserted were water leaks coming from upstairs into the convenience store and once out of anger after Ms. Poonawalla entered Gas Express and informed Mr. Kalariya's father that Uma Shiv would have to pay the water bill for the entire building. Mr. Kalariya presented video evidence of water leaks occurring at Gas Express, purportedly filmed on June 5, 2017, and August 28, 2017. It is undisputed that during one of the incidents when the water was shut off, the hair salon owner left a water sprayer on because she could not discern whether it was on or off, causing some water damage when the water to the building was turned back on.

As to payment of the monthly water utility bill, Mr. Kalariya undisputedly became upset during the summer of 2017 when Ms. Poonawalla informed him that Uma Shiv would have to pay the water bill for the entire building because the water meter could only be read for the entire amount of water used. The Poonawallas subsequently had separate water meters installed so that Uma Shiv would be charged with only its share. However, by that time, Southeast Diamond had sent a notice of termination to Uma Shiv,

and the parties were each represented by counsel. The record indicates that Mr. Kalariya thereafter paid Uma Shiv's water bill via his counsel, who had to obtain the amount of the bill from Southeast Diamond's counsel after the Poonawallas had read the water meters on the Property. Various delays occurred in Uma Shiv's payment of the water bills during the pendency of this action, and Southeast Diamond alleged that Mr. Kalariya had at times dated checks earlier than they were postmarked. However, the trial court found in its final judgment that by the time of trial, Uma Shiv had paid its share of the water utility bill in full.

The trial court conducted a bench trial over the course of four days on January 10, 2019; January 30, 2019; April 10, 2019; and August 7, 2019. In addition to testimony presented by each of the Poonawallas and Mr. Kalariya, Southeast Diamond called as witnesses Mr. Holloway; Ms. DeHope; Colin Hurst, the City's fire marshal; Paul McAllister, a plumber who had inspected Gas Express for water leaks; Delilah Restendic, the former operator of the hair salon on the Property; and Amin Jooma, the father of Aziz Jooma. In addition, Uma Shiv presented the testimony of Joe Manes with Service Station Maintenance, who had been retained in the summer of 2017 by Kawal, Inc., and subsequently by Uma Shiv to assist with TDEC compliance at Gas Express.

Following consideration of witness testimony, exhibits, and post-trial memoranda submitted by counsel for each party, the trial court entered a judgment on November 18, 2019, dismissing Southeast Diamond's complaint upon finding that Southeast Diamond had failed to carry its burden of proof to demonstrate that Uma Shiv had materially breached the Lease. The trial court also found, *inter alia*, that Southeast Diamond had "failed to comply with the lease requirement to provide written notice to [Uma Shiv] of any alleged breaches/defaults, with opportunity to cure—though any such breaches/defaults have in fact been cured." Southeast Diamond timely appealed.

## II. Issues Presented

Southeast Diamond presents three issues on appeal, which we have restated as follows:

1. Whether the trial court erred by determining that Uma Shiv did not materially breach the Lease.

2. Whether the trial court erred by determining that any breaches of the Lease committed by Uma Shiv had been cured.

3. Whether the trial court erred by failing to consider repeated violations of TDEC rules and regulations purportedly committed by

13

Uma Shiv in operating Gas Express that allegedly placed Southeast Diamond at great risk of harm and for which Uma Shiv denied responsibility.

## III.  Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise.  *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012).  "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect."  *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)).  We review the trial court's conclusions of law, including its interpretation of a written agreement, *de novo* with no presumption of correctness.  *See Ray Bell Constr. Co., Inc. v. State, Tenn. Dep't of Transp.*, 356 S.W.3d 384, 386 (Tenn. 2011); *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

## IV.  Material Breach of Contract

Southeast Diamond contends that the trial court erred in finding that it had not carried its burden of proof to demonstrate a material breach of contract as to the Lease committed by Uma Shiv.  Southeast Diamond further contends that it proved the following alleged ten material breaches of the Lease:  (1) violation of TDEC rules and regulations and refusal to accept responsibility for the underground storage tanks and TDEC reporting, (2) denial of access to TDEC-related documents to Southeast Diamond, (3) tardiness in correcting TDEC violations, (4) history of late payment of TDEC tank fees, (5) violation of City codes and untimeliness of corrections, (6) denial of access to Gas Express to Southeast Diamond's owners, (7) failure to make required plumbing and electrical repairs or to reimburse Southeast Diamond for such repairs, (8) nonpayment of water utility bills until after the instant action was filed, (9) acts of turning the water off to the entire building, and (10) false claims of water leaks at Gas Express.[3]  Upon thorough review of the record and applicable authorities, we determine that the evidence does not preponderate against the trial court's finding that Uma Shiv did not materially breach the Lease.

---

[3] We have reordered the breach allegations presented in Southeast Diamond's appellate brief for ease of reference.

.
Regarding contract interpretation, this Court has previously explained:

> In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc*., 78 S.W.3d 885, 889-90 (Tenn. 2002) (citing *Guiliano v. Cleo, Inc*., 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co*., 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc*., 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co*., 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id*. (quoting 17 Am. Jur. 2d, *Contracts*, § 245).

> This Court's initial task in construing the Contract at issue is to determine whether the language of the contract is ambiguous. *Planters Gin Co*., 78 S.W.3d at 890. If the language is clear and unambiguous, the literal meaning of the language controls the outcome of the dispute. *Id*. A contract is ambiguous only when its meaning is uncertain and may fairly be understood in more than one way. *Id*. (emphasis added). If the contract is found to be ambiguous, we then apply established rules of construction to determine the intent of the parties. *Id*. Only if ambiguity remains after applying the pertinent rules of construction does the legal meaning of the contract become a question of fact. *Id*.

*Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698-99 (Tenn. Ct. App. 2005). "Whether a party has fulfilled its obligations under a contract or is in breach of the contract is a question of fact." *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 225 (Tenn. Ct. App. 2009).

However, the fact that one party has breached a contract is not "sufficient to relieve the non-breaching party of its contractual obligations" unless the initial breach

15

was "material." *M & M Elec. Contractor, Inc. v. Cumberland Elec. Membership Corp.*, 529 S.W.3d 413, 423 (Tenn. Ct. App. 2016). "If the breach of contract 'was slight or minor, as opposed to material or substantial, the nonbreaching party is not relieved of his or her duty of performance, although he or she may recover damages for the breach.'" *Id.* (quoting *Anil Constr. Inc. v. McCollum*, No. W2014-01979-COA-R3-CV, 2015 WL 4274109, at *12 (Tenn. Ct. App. July 15, 2015)). As this Court has recently explained:

> [I]n determining whether a breach of contract is material such that the non-breaching party can avoid performance, Tennessee courts have adopted the criteria established in section 241 of the Restatement (Second) of Contracts (1981), which enumerates the following factors to consider:
>
> (1) The extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (2) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (4) The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and
>
> (5) The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Cooper v. Patel*, 578 S.W.3d 40, 46 (Tenn. Ct. App. 2018) (quoting factors as stated in *Adams TV of Memphis, Inc. v. ComCorp of Tenn., Inc.*, 969 S.W.2d 917, 921 (Tenn. Ct. App. 1997)).

In its final judgment, the trial court set forth detailed findings of fact and conclusions of law. Specifically as to credibility of the parties as witnesses, the trial court found the following:

> The Court finds Setu Kalariya to be a credible witness, and the Court credits his testimony. His responses to questions were more direct and

16

straight-forward. The Court finds his testimony to be truthful, honest and sincere.

The Court does not find the Poonawallas' testimony to be credible in certain key respects. The Court finds that [Southeast Diamond] wanted [Uma Shiv] out as a tenant in order to enter into a more profitable lease with another prospective tenant, and with lease terms more favorable to [Southeast Diamond] with respect to the operation of the gasoline pumps and underground gasoline storage tanks. Allegations of lease breaches were designed to try to accomplish [Southeast Diamond's] goal of evicting [Uma Shiv].

(Paragraph numbering omitted.) In determining that Uma Shiv had not materially breached the Lease, the trial court stated the following "Conclusions of Law" in pertinent part:

The Court concludes that [Southeast Diamond] has failed to carry its burden of proof that [Uma Shiv] has engaged in any material breach of the lease, let alone one that would justify forfeiture of [Gas Express] and eviction of the tenant.

1.  Certainly there have been problems [at Gas Express] with respect to compliance with TDEC regulations governing gasoline pumps and underground gasoline storage tanks. Not only, however, has the Court found Defendant's testimony to be credible when Setu Kalariya testified that his agreement with his previous landlord was that the landlord would be responsible for the gasoline pumps and underground tanks, and [Uma Shiv] would be responsible for the "inside" of the market; that understanding is supported by the terms of the lease. Where the lease addresses [Uma Shiv's] obligations for making repairs on the premises, it is largely silent when it comes to the pumps and tanks, mentioning only [Uma Shiv's] obligation to pay the yearly tank renewal fees.

2.  Some of those problems were [Southeast Diamond's] responsibility and could only be remedied by [Southeast Diamond].

3.  All of the TDEC compliance issues were cured, and [Gas Express] presently remain[s] in compliance, including payment of the annual tank renewal fees.

17

4.    Likewise, all City of Alcoa code violation problems—including some which were not [Uma Shiv's] responsibility—have been cured.

5.    The payment of any unpaid water utility bills has been cured.

6.    [Southeast Diamond] has failed to carry its burden of proof that [Uma Shiv] interfered with [Southeast Diamond's] right to have access to [Gas Express] at any and all reasonable times.

Furthermore, [Southeast Diamond] failed to comply with the lease requirement to provide written notice to [Uma Shiv] of any alleged breaches/defaults, with opportunity to cure—though any such breaches/defaults have in fact been cured.

The Court has found [Southeast Diamond's] agents' testimony not to be credible, and that they wanted [Uma Shiv] out as a tenant in order to lease [Gas Express] at a high rental amount, and with a new lease containing more favorable language to [Southeast Diamond] on the operation of the gas pumps and underground tanks. They were trying to find breaches and defaults in order to leverage [Uma Shiv] into signing a new lease. [Southeast Diamond] was not, however, entitled to a new lease; [Southeast Diamond] acquired the subject property subject to the existing lease, and [Southeast Diamond] was aware of at least some TDEC violations when it chose to acquire the property. The best evidence that the alleged material breaches were not in fact material, and were of minimal significance to [Southeast Diamond], is that [Southeast Diamond] was more than willing to continue to lease the property to [Uma Shiv] had [Uma Shiv] been willing to execute a new lease with terms more favorable to [Southeast Diamond].

[Southeast Diamond] simply has not carried its burden of proof.

Furthermore, forfeiture of the leasehold would not be equitable to [Uma Shiv]. Any alleged breaches, if any, not only can be remedied by compensation or otherwise, they have been. All have been cured, including at expense to [Uma Shiv]. [Southeast Diamond] has been placed in the same condition as if any alleged breach had not occurred.

[Southeast Diamond] has been deprived of very little, if anything; at most it would be minimal. On the other hand, the potential loss to [Uma Shiv] would be tremendous if [Gas Express] were to be ordered forfeited.

18

[Mr. Kalariya] has worked very hard to build a successful business on the premises. The loss that would accrue to [Uma Shiv] greatly outweighs any deprivation, if any there be, to [Southeast Diamond] as landlord.

It is, therefore, ORDERED, ADJUDGED and DECREED that [Southeast Diamond] has failed to carry its burden of proof, and [Southeast Diamond's] complaint (the underlying detainer warrant) is dismissed.

(Internal citations to record omitted.) We will address each of the breaches alleged by Southeast Diamond in turn.

A. Alleged Breaches Involving TDEC Violations

Four of the ten alleged material breaches of the Lease claimed by Southeast Diamond involve violations of TDEC rules and regulations at Gas Express. Additionally, Southeast Diamond has raised a separate issue, asserting that the trial court failed to properly consider the "great risk of harm" posed to Southeast Diamond by Uma Shiv's insistence that the Lease does not assign responsibility to Uma Shiv for TDEC compliance. Southeast Diamond's argument in support of this separate issue concerning TDEC violations appears to be in response to the trial court's analysis of the equity between the parties and the court's findings that Southeast Diamond had "been placed in the same condition as if any alleged breach had not occurred" and had "been deprived of very little, if anything." In its reply brief and in answer to Uma Shiv's questioning of why a separate issue had been raised regarding the TDEC violations, Southeast Diamond states that the "TDEC violations are by far the most concerning of the breaches of the Lease" and that "[c]oncerns about TDEC compliance are what is driving" Southeast Diamond to seek eviction of Uma Shiv. Noting Southeast Diamond's particular concerns regarding the TDEC violations, we will address the four alleged breaches that involve TDEC together in this one subsection, inclusive of the third issue raised by Southeast Diamond.

First, Southeast Diamond alleges that by allowing violations of TDEC rules and regulations to occur at Gas Express and not taking responsibility for maintenance of the underground storage tanks and TDEC reporting, Uma Shiv breached the following provision contained in paragraph four of the Lease:

Lessee agrees to use the Leased Premises in conformity with all municipal, county, State and Federal laws and regulations affecting Leased Premises and will save Lessor and its successors and assigns harmless from penalty, damage or charge for violation of any of said laws and regulations by Lessee.

Specifically concerning the TDEC violations, the trial court made the following findings of fact:

> [C]ertainly there were numerous TDEC violations pertaining to the gasoline pumps and underground gasoline storage tanks. Jessica O. DeHope, environmental scientist with the TDEC division of underground storage tanks, testified to the violations. These problems go back as far as 2013, although the most serious issues began in 2015. While the violations varied in terms of severity, some were considered severe, and others were not. The violations were "fairly common," especially with respect to "paperwork."
>
> * * *
>
> From the State's perspective, there are some violations, for example, record-keeping violations, where the State looks to the operator of the market or gasoline station, even if the operator is a tenant rather than the owner of the property, or to the tenant because the tenant has been designated the A and B operator. For other violations, the owner of the property is held responsible. It is also the case that either the owner or the operator could be held responsible for certain of the violations. At least some of the State's correspondence was sent to [Uma Shiv] because the State had no other name on file.
>
> All markets where gasoline is sold, as well as gasoline stations, are required to have an A and B operator. Only the property owner, however, has access to the online account, and only the owner, therefore, can designate the A and B operator; a tenant cannot do that. One of the problems with the State was failure to designate the A and B operator, and only [Southeast Diamond] could do that. Only [Southeast Diamond] could remedy that violation.
>
> Likewise, only [Southeast Diamond], as owner, could report the change in ownership of the property, and failure to do so was also a problem.
>
> Not all of the state inspections were prompted by violations and compliance follow-up. Just like the City of Alcoa required an inspection of the commercial property when ownership changed, TDEC also required an inspection when ownership of the subject property changed.

There was one problem that could not be remedied, in one sense: Once certain reports were not printed and retained due to a malfunctioning printer, it became impossible for those reports to be generated and maintained. All other problems were remedied. They have been cured. Even with respect to the printer problem and missing reports, the parties were able to resolve that problem by choosing Option C under TDEC's final order and assessment: Completion of underground storage tank training. [Mr. Kalariya] has completed that training. Presently [Gas Express is] in compliance, and there have been no violations since August 2017. Again, all problems have been cured.

Zaheer Poonawalla and Johaina Poonawalla knew of the TDEC violations, issues and problems when they acquired title to [Gas Express], and then subsequently conveyed the property to [Southeast Diamond]. That knowledge included that . . . the issues had not been resolved, and that an enforcement case was pending.

The Poonawallas own other gas stations and are experienced in dealing with state regulations governing the operation of gas stations.[4]

Setu Kalariya also testified as president of Defendant, Uma Shiv, Inc. While it may not matter—in terms of his responsibility to comply with state regulations as an operator of gasoline pumps and underground storage tanks—nevertheless Kalariya did not have previous experience with operation of a gas station or market with gas pumps. It does matter that when [Uma Shiv] entered into its lease . . . with Kawal, Inc. d/b/a Gas Express, [Uma Shiv] had an understanding with its landlord ([Southeast Diamond's] predecessor) that [Uma Shiv] would be responsible for the "inside" of the market, and the landlord would be responsible for the "outside" of the market, including the gasoline pumps and underground storage tanks. The landlord made clear to Kalariya that he would not have responsibility for the underground storage tanks and equipment. The printer and much of the gasoline equipment was old and did not function properly.

The lease . . . is consistent with Kalariya's understanding because it makes no reference to maintenance of the gasoline pumps and underground storage tanks, but rather, in terms of [Uma Shiv's] responsibilities, only to

---

[4] According to the Poonawallas' respective testimonies, their other gas stations were located in Alabama, but each testified that the applicable regulatory systems between Tennessee and Alabama were similar.

plumbing, electrical repair, heat and air repairs, and payment of the annual tank renewal fees.

Furthermore, the Asset Purchase Agreement [Uma Shiv] entered into with its previous landlord ([Southeast Diamond's] predecessor) specifically provides, at §3.4, that "Purchaser [Uma Shiv] will have gas tanks inspected and the **Seller will correct any problems at its expense** [emphasis added]."

Kalariya began operating the market in April 2013. He and his wife worked very hard for two years before business began to improve and [Uma Shiv] began to earn profits. They worked daily from 6 a.m. to 11 p.m., paid off their loans for acquisition of the business and its assets, and built their business. They had a good relationship with their prior landlord. They had some problems with the residential tenants located on the second floor of the [building on the Property], but nothing rose to the level of any interference with the business.

Kalariya first became aware of TDEC violations in 2015. His prior landlord never told him it was [Uma Shiv's] responsibility to correct those violations. [Uma Shiv] and the landlord agreed to "fix" the problems together. They initially retained Jerry McDowell to address the problems, although Kalariya is uncertain about who paid McDowell. He assumed McDowell had taken care of the matters until he learned otherwise in 2017. It is interesting to note that there is a gap in the state TDEC correspondence between 2015 and 2017, which supports Kalariya's testimony.

(Paragraph numbering and internal citations to record omitted.)

Upon thorough review of the record, we determine that the evidence preponderates in favor of the trial court's factual findings concerning this issue. As the trial court noted, the Lease is silent as to responsibility related to TDEC regulatory compliance, including underground storage tank maintenance, gas pump maintenance, and the record-keeping required by TDEC. Southeast Diamond relies on the general provision that Uma Shiv will "use the Leased Premises in conformity with all municipal, county, State and Federal laws and regulations affecting Leased Premises" to assert that Uma Shiv had agreed in the Lease to full responsibility for maintenance of the underground storage tanks and compliance with TDEC regulations. Mr. Manes, designated by the trial court as "an expert in the field of TDEC compliance," testified that although the tenant is a point of contact with TDEC and may assume some responsibility as an A, B operator of a gas station, TDEC ultimately looks to the property owner as responsible for violations.

22

Mr. Poonawalla testified that he and Ms. Poonawalla desired to have Uma Shiv enter into a new lease in great part because "[t]he current lease does not outline the rules and responsibilities of each party" as to TDEC. However, because the original Lease still governs the lessor/lessee relationship in this matter, we determine that the trial court properly found that the Lease unambiguously does not assign responsibility for underground storage tank maintenance and TDEC compliance to Uma Shiv and that Uma Shiv did not breach the Lease through the TDEC violations. *See Kafozi*, 184 S.W.3d at 698 ("The parties' intent is presumed to be that specifically expressed in the body of the contract."). Additionally, given that the Lease is silent as to this issue, we emphasize that the trial court's findings concerning witness credibility as it relates to the original agreement between Uma Shiv and Southeast Diamond's predecessor are entitled to great deference on appeal. *See Morrison*, 338 S.W.3d at 426.

Second, Southeast Diamond alleges that Uma Shiv beached the covenant of good faith and fair dealing by denying Southeast Diamond access to its TDEC-related records. In support of this allegation, Southeast Diamond cites Mr. Poonawalla's testimony that he and Ms. Poonawalla had requested access to Gas Express's records kept for TDEC "multiple times" through counsel but had been denied access by Uma Shiv's counsel. Although in determining that Uma Shiv had committed no material breach of the Lease, the trial court found that Southeast Diamond had failed to prove that it had been denied access to Gas Express by Uma Shiv, the court did not make an express finding as to access to the TDEC records kept at Gas Express.

As to the covenant of good faith and fair dealing, this Court has elucidated:

> Tennessee courts have required contracting parties to deal with each other fairly and in good faith, even when such a duty is not explicitly embodied in their contract. *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 198 (Tenn. Ct. App. 1990) (citing *Williams v. Maremont Corp.*, 776 S.W.2d 78, 81 (Tenn. Ct. App. 1988); *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987); *Covington v. Robinson*, 723 S.W.2d 643, 645 (Tenn. Ct. App. 1986)). "Tennessee law recognizes an implied covenant of good faith and fair dealing in every contract." *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013). "What this duty consists of, however, depends upon the individual contract in each case." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (quoting *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)). The common law duty of good faith does not extend beyond the reasonable contractual expectations of the parties. *Id.*

*M & M Elec. Contractor,* 529 S.W.3d at 426.

The record indicates that Southeast Diamond had attempted to obtain TDEC records for Gas Express that were maintained by Mr. Manes after he was retained in the summer of 2017 by Aziz Jooma to assist in resolving compliance issues for Gas Express and subsequently retained by Uma Shiv to monitor monthly the underground storage tanks, gas pumps, and TDEC reporting. Mr. Manes testified that he referred Ms. Poonawalla to Uma Shiv's counsel when she requested records from him. As Uma Shiv notes, during discovery Southeast Diamond obtained TDEC's file on Gas Express and presented multiple exhibits from the file. Southeast Diamond did not, however, subpoena TDEC-related records from Uma Shiv. Recognizing that any dispute concerning access to TDEC records arose after Southeast Diamond had begun proceedings to terminate the Lease, we determine this issue to be in the nature of a discovery dispute rather than a breach of the covenant of good faith and fair dealing. Southeast Diamond is not entitled to relief based on this alleged breach.

Third, Southeast Diamond alleges that Uma Shiv breached the Lease by being "repeatedly late in making payments or correcting known violations." Insofar as this allegation relates to correction of TDEC violations, we have already determined that the evidence does not preponderate against the trial court's finding that Uma Shiv did not materially breach the Lease in its handling of the TDEC violations at Gas Express. In support of this allegation of breach, Southeast Diamond also cites to Mr. Poonawalla's testimony concerning payment of Uma Shiv's portion of the water utility bill and Ms. Poonawalla's testimony concerning the timeliness of corrections to City code violations, apparently in an attempt to establish a pattern of untimeliness on Uma Shiv's part. We will address Southeast Diamond's allegations of breach concerning the water bill and City code violations in a subsequent section of this opinion. However, we note here that we find Southeast Diamond's attempt to establish a pattern of untimeliness on Uma Shiv's part as a material breach of the Lease unavailing.

Fourth, Southeast Diamond alleges that through what it terms a "history of being late with [its] payment of TDEC tank fees," Uma Shiv violated the concluding sentence of paragraph eight in the Lease, which provides: "Lessee shall also be responsible for the yearly tank renewal fees." Uma Shiv acknowledges that under the plain language of the Lease, it is responsible for payment of the underground tank fees. Mr. Poonawalla testified that when he and Ms. Poonawalla first assumed ownership of the Property, Mr. Kalariya told him that Uma Shiv would not pay the tank fee. However, Mr. Poonawalla acknowledged that when Southeast Diamond sent a check to TDEC in January 2018 in the amount of $375.00 for the tank fee, TDEC returned the check because Uma Shiv had already paid the fee. When questioned regarding a TDEC violation incurred in 2013 because Uma Shiv did not pay the tank fee on time, Mr. Kalariya testified that he initially

24

missed the payment due to his unfamiliarity with the system. According to Mr. Kalariya, TDEC then "red tagged" his underground storage tank, meaning that it would be unable to receive gasoline delivery, and after calling the TDEC number on the tag, he immediately submitted payment. The trial court found in its final judgment that "[a]ll annual tank renewal fees have been paid."

Inasmuch as the record reflects that Uma Shiv had regularly paid the yearly tank fee and that the only time Uma Shiv was late with a tank fee predated Southeast Diamond's ownership of the Property, we determine that Uma Shiv did not breach the Lease through late payments of TDEC tank fees. Having determined that none of the alleged breaches involving TDEC violations were breaches of the Lease, we further determine that any analysis of materiality as to these four alleged breaches is pretermitted as moot. *See generally M & M Elec. Contractor, Inc.*, 529 S.W.3d at 423.

### B. Other Alleged Material Breaches

The remaining alleged material breaches that Southeast Diamond asserts it proved are not directly related to the TDEC violations. As a fifth alleged breach, Southeast Diamond contends that the trial court erred by finding that Uma Shiv was not in material breach of the Lease due to violations of the City code found at Gas Express and the alleged untimeliness of corrections to those violations made by Uma Shiv. In support of this contention, Southeast Diamond again primarily relies on paragraph four of the Lease providing for Uma Shiv's utilization of Gas Express "in conformity with all municipal, county, State and Federal laws and regulations affecting Leased Premises . . . ." Citing Mr. Holloway's and Mr. Hurst's respective testimonies that the City violations on the Property that involved Gas Express were corrected without the issuance of any fines or penalties, Uma Shiv contends that "the building codes violations were not a breach of the Lease and, even if they were, were not material."

In determining that the City code violations did not constitute a material breach of the Lease, the trial court made the following pertinent findings of fact in its judgment:

> There were City of Alcoa code violations existing on the property where [Gas Express is] located. Gary Holloway, the building code official and code enforcement officer for the City, detailed the violations. These violations surfaced as a result of [Southeast Diamond's] purchase of the property and the resulting "tenant change" from the City's perspective, which prompted an inspection. . . . Not all of the violations were found inside [Gas Express]. Some of the problems were located in other areas of [Southeast Diamond's] building where [Gas Express is] located on the first floor, including [Southeast Diamond's] improper residential leasing of

25

rooms on the second floor when the property was not zoned for residential leases. Colin Hurst, City fire marshal, also testified as to the nature of the code violations.

Indeed, significant renovations to the upper level would have been required for [Southeast Diamond] to lawfully lease the upstairs space for residential purposes, including installation of a two-hour rated ceiling or sprinklers.

It is common for City agents to find such violations when inspections are conducted. While these violations ranged in degree from minor to severe, they were mostly typical type violations and easily correctible.

All of the City code violations were remedied in a timely fashion. They were cured.

(Paragraph numbering and internal citations to record omitted.)

In analyzing whether the City code violations involving Gas Express constituted a breach of the Lease, we note the distinction in the parties' respective interpretations between whether any violation of a municipal code, such as combustible material in this instance stored too close to a water heater, would constitute a breach of paragraph four or whether compliance with City officials in correcting violations means that the lessee has conformed with regulations governing such a fire hazard. The trial court found that the violations at issue had been timely remedied, and we determine that the evidence preponderates in favor of this finding.

According to Mr. Holloway's July 13, 2017 notice to the parties, Fire Marshal Hurst and he had conducted on-site inspections of Gas Express four times in May and June of 2017. Southeast Diamond emphasizes the fact that none of the City code violations were corrected during the period between the first and last of these May-June inspections. However, Mr. Holloway acknowledged in his testimony that the July 13, 2017 notice conflated violations that were upstairs in the building with those in Gas Express and that the concern regarding fire-resistant material in the ceiling of Gas Express was related to whether the upstairs was going to be used for residential purposes. Mr. Holloway sent the parties a follow-up notice on July 19, 2017, in which he isolated the violations particular to Gas Express. Mr. Kalariya testified that he found the initial information concerning the violations confusing because much of it, involving, for example, bathroom facilities upstairs, had nothing to do with Gas Express. It is undisputed that by the time of the August 30, 2017 inspection conducted by Mr.

26

Holloway and Mr. Hurst, all of the City code violations had been corrected either by Uma Shiv or Southeast Diamond.

Upon careful review, we determine that to the extent that Uma Shiv allowed violations of the City code to exist within Gas Express that could have been promptly corrected and were not, these violations constituted a minor breach of paragraph four of the Lease. Through violations of the City code specific to Gas Express, Southeast Diamond was not deprived of a reasonably expected benefit because Uma Shiv worked with authorities to correct the violations and no fines or penalties were incurred as a result. *See Cooper*, 578 S.W.3d at 46. Moreover, as the trial court found, "forfeiture of the leasehold would not be equitable to [Uma Shiv]." *See id.* (noting "[t]he extent to which the party failing to perform or to offer to perform will suffer forfeiture" as one of the factors to consider when determining materiality of a breach); *Miller v. Cain P'ship, Ltd.*, No. 1993 WL 268888, at *6 (Tenn. Ct. App. July 20, 1993) ("Forfeitures are not favored in equity and unless the penalty is fairly proportionate to the damages suffered by the breach, relief will be granted when the lessor can, by compensation or otherwise, be placed in the same condition as if the breach had not occurred." (quoting *Hooten v. Nacarto GMC Truck, Inc.*, 772 S.W.2d 41, 46 (Tenn. Ct. App. 1989))). We therefore agree with the trial court's determination that the City code violations did not constitute a material breach of the Lease.

Sixth, Southeast Diamond alleges that Uma Shiv breached the Lease by denying the Poonawallas physical access to Gas Express.[5] Paragraph five of the Lease provides: "Lessor, or its agents, successors, or assigns shall have the right to enter upon and inspect the Leased Premises at any and all reasonable times." The parties' dispute as to this provision centers on their differing interpretations of "reasonable times." In determining that Uma Shiv had not materially breached this provision, the trial court referenced the following findings of fact in its judgment:

> [Southeast Diamond] also alleges that [Uma Shiv] interfered with [Southeast Diamond's] "right to enter upon and inspect [Gas Express] at any and all reasonable times," including one or more occasions when Setu Kalariya's father denied [Southeast Diamond] and its agents access to [Gas Express].

---

[5] We note that Southeast Diamond did not allege Uma Shiv's denial of its access to Gas Express as a material breach of the Lease in its amended complaint. However, inasmuch as Uma Shiv did not object at trial to the presentation of evidence regarding this alleged breach and the trial court clearly treated it as one of Southeast Diamond's allegations, we determine that breach by denial of access was tried by implied consent. *See* Tenn. R. Civ. P. 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").

[Uma Shiv] has conceded that there were times when [Southeast Diamond] and its agents were denied access, but [Mr. Kalariya] denies that there was any interference with access to the premises at "reasonable times," and testified that there were times when [Southeast Diamond's] request for access to the premises was not reasonable. For example, [Mr. Kalariya] considered certain of [Southeast Diamond's] demands to be threats to interfere with [Uma Shiv's] business, including access to make certain improvements to the building which would have interfered with [Uma Shiv's] business and even required the business to temporarily close. This potential interference included when [Southeast Diamond] was considering installing a properly fire-rated ceiling in order to bring the building into compliance to allow for residential tenants on the second floor. There were times when [the Poonawallas] insisted on coming onto the premises when Kalariya was not present, and Kalariya had concerns about [Southeast Diamond] or its agents coming into [Uma Shiv's] place of business and issuing directives to [Uma Shiv's] employees. [Mr. Kalariya] considered some of [Southeast Diamond's] coming onto the premises to be disruptive to [Uma Shiv's] business.

(Paragraph numbering and internal citations to record omitted.)

Southeast Diamond argues that the trial court impermissibly allowed Uma Shiv to rewrite the term, "reasonable times," in the applicable Lease provision to mean only when Mr. Kalariya was present on the grounds of Gas Express. We disagree. Mr. Poonawalla acknowledged that he and his sister had regularly been granted access to Gas Express to read the water meters, but he stated: "We have been asked not to record anything. If we need to take some pictures so that we can report it, we don't have access to that either." In a confusing section of testimony, Ms. Poonawalla complained that Mr. Kalariya's father had wanted to check her cellular telephone for photographs of the Property before she left the grounds one day, eventually acknowledging that she had been granted access to Gas Express that day before the incident occurred. We emphasize again that the trial court's finding that Mr. Kalariya was the more credible witness is afforded great deference on appeal. *See Morrison*, 338 S.W.3d at 426. Additionally, Southeast Diamond has offered no proof that it was harmed by Mr. Kalariya's reluctance to have his employees interact with the Poonawallas when he was not present or his objections to completion of repairs benefiting the upstairs of the building that would have necessitated closure of his business. We therefore agree with the trial court that any circumstantial denial of access to Gas Express did not constitute a breach of the Lease, let alone a material breach, on Uma Shiv's part.

28

Seventh, Southeast Diamond alleges that Uma Shiv breached the Lease by failing to make required plumbing and electrical repairs or to reimburse Southeast Diamond for such repairs. The penultimate sentence of paragraph eight of the Lease provides: "Lessee shall be responsible for plumbing, electrical repair, and heat and air repair." The trial court in its final judgment did not address this purported breach as a separate allegation, although, as noted above, the court did address the repairs made to correct City code violations. Upon careful review, we determine that the repairs referred to by Southeast Diamond are those made during the summer of 2017 when both Southeast Diamond and Uma Shiv undertook to correct the City code violations.

The Poonawallas each respectively testified that they began making repairs to Gas Express but that Mr. Kalariya then complained, through his counsel, that the Poonawallas were interfering with his business. Testimony presented by the Poonawallas and Mr. Kalariya indicated that Mr. Kalariya then finished the needed repairs to correct City violations at Gas Express. The trial court found that all of the City code violations were cured and that Mr. Kalariya "took action to address many of them." In its findings of fact, the trial court also found that in the July 6, 2017 letter to Uma Shiv's counsel, Southeast Diamond's counsel had "for the first time . . . itemize[d] a list of repairs that need[ed] to be made," "consist[ing] of certain electrical work, plumbing, a drop ceiling, relocation of a water heater, storage of items near that water heater, and storage of gasoline inside the premises," without stating that it would be Uma Shiv's responsibility to make those specific repairs.

During Mr. Poonawalla's testimony, Southeast Diamond presented an undated list of invoice amounts entitled, "Damages incurred in material cost City Violations," in the total amount of $1,595.45, which Mr. Poonawalla stated had been sent to Uma Shiv without any payment received. However, as Uma Shiv notes on appeal, the receipts attached to the "Damages incurred" list include some items that would clearly not have been Uma Shiv's responsibility, including a plumber's receipt stating that upon inspection for leaks in the building, he had found "2 showers that need repair[]" and materials receipts from a building supply store with no explanation of how the materials were used. Considering that both Southeast Diamond and Uma Shiv undertook to make repairs in response to the City code violations, that several of the City violations involved the upstairs portion of the Property, and that the "Damages incurred" list does not include explanations of the reasons for the various invoices and receipts, we conclude that Southeast Diamond did not prove breach of contract, let alone a material breach, as to the Lease provision requiring Uma Shiv to be responsible for "plumbing, electrical repair, and heat and air repair" within Gas Express.

Southeast Diamond's eighth, ninth, and tenth allegations of material breach all involve the water utility to the building on the Property. Specifically, Southeast Diamond

29

contends that the trial court erred by declining to find that Uma Shiv had materially breached the Lease through (8) nonpayment of water utility bills until after the instant action was filed, (9) acts of turning the water off to the entire building, and (10) false claims of water leaks at Gas Express. Paragraph ten of the Lease provides: "Lessee will pay for all charges for utilities consumed at or supplied to the Leased Premises." Southeast Diamond thereby asserts that Uma Shiv violated this provision of the Lease by delaying payment on its water utility bill. As to the ninth and tenth allegations of breach, Southeast Diamond appears to rely on the covenant of good faith and fair dealing, or, as the trial court noted in its judgment, these two allegations, rather than being related to actual breach of the Lease, appear to have been "offered to the Court as evidence of why [Uma Shiv] has allegedly been a 'bad tenant'" (quoting Southeast Diamond's opening statement).

The trial court found that "[w]hile there might have been a time when some water utility bills were paid late, all have now been paid, and breach/default, if any, has been cured." The trial court also made the following pertinent findings of fact concerning the situation with the water utility in the building:

> At the time [Southeast Diamond] acquired title to the subject property, the water utility issue was complicated by the fact that there was one water meter on the property, and all of the water charges which were incurred on the premises, including the other tenants on the second floor, were part of [Uma Shiv's] bill which then had to be apportioned. That arrangement was later remedied, but until it was remedied it was understandably a point of contention between the parties, and a source of aggravation to [Uma Shiv].

> [Southeast Diamond] alleges that there were times when [Uma Shiv] cut-off the water supply to the entire building, including the other tenants, and based on alleged false claims of water leaks. [Southeast Diamond] further alleges that [Uma Shiv] caused the water to be turned off a second time after having been instructed not to do that again.

> [Southeast Diamond] alleges that there were never any leaks. The first time, there was apparently water in the floor, but [Southeast Diamond] claims the source of the leak was never found. The second time, [Southeast Diamond] claims no leak was ever found. [Southeast Diamond] offered the testimony of Paul McAllister, [Southeast Diamond's] plumber, who went to the premises twice and testified he did not find any leaks. The second trip, however, he apparently found where an upstairs commercial client, who

30

operated a salon, had left a hair wash "sprayer" on which had caused water to be in the floor upstairs.

The upstairs commercial tenant, Delilah [Restendic], also testified for [Southeast Diamond]. She said that [Mr. Kalariya] had been nice to her, and that the only bad experience she had with [Mr. Kalariya] related to one time when the water was shut-off to the building. She has given up her lease at the property motivated by her desire not to be involved in disputes between the parties, and also because she lives in Morristown, and the drive to her shop was too far.

[Uma Shiv] concedes that the water was turned off twice, in June and August 2017. [Mr. Kalariya] insists, however, that there were leaks, that there was one time when there was a problem because Johaina Poonawalla was insisting that he pay the water bill for the entire building— including the upstairs tenants, and that the reason [Southeast Diamond] did not find evidence of leaks is because [Uma Shiv] had caused the water to be cleaned up before [Southeast Diamond] or its agents arrived on the premises.

[Mr. Kalariya] testified [Uma Shiv] was always willing to pay its share of the water utility bill, but it wanted the bill broken down between what [Uma Shiv] owed and what the other tenants owed, and that is what led to any unpaid, or untimely paid, water bills—all of which have now been paid and any default cured.

[Uma Shiv] provided the most persuasive, compelling evidence related to the water issues. [Uma Shiv] offered into proof video evidence of water leaks on the premises. The video showed a substantial amount of water in the floor, and water dripping from the ceiling through a light fixture.

[Paragraph numbering and internal citations to record omitted.]

The trial court thus found that Uma Shiv had been persuasive in presenting evidence of water leaks on two occasions even as Mr. Kalariya acknowledged that he had turned off the water once in frustration over the consolidation of the water utility bill for the entire building. We agree with the trial court that in presenting its proof involving Mr. Kalariya's turning off the water and falsely reporting leaks, Southeast Diamond has failed to establish any breach of the Lease. As to the allegation of breach via nonpayment of the water bill until the instant action was filed, the evidence preponderates

31

in favor of the trial court's finding that "some water utility bills were paid late." However, Uma Shiv presented evidence that the delays in paying the water bills were due both to the confusion surrounding the consolidated bill and to a complicated system of notice to Uma Shiv of the amount due and payment to Southeast Diamond through the parties' respective counsel. During testimony, Mr. Kalariya specifically denied Southeast Diamond's allegation that he had purposefully written a check dated weeks before he sent it, stating that the delay in sending the check had occurred in his counsel's office.

We determine that Uma Shiv's delays in payment of the water utility bill constituted a minor breach of paragraph ten of the Lease and that the trial court properly found this breach not to be material. Southeast Diamond has not been deprived of a reasonably expected benefit, and it has already been compensated through full payment of the water bill. *See Cooper*, 578 S.W.3d at 46. Moreover, Uma Shiv has cured the breach through full payment and, considering the extenuating circumstances of the consolidated water bill and the complicated system of payment, has not failed to comport with standards of good faith and fair dealing in this regard. *See id.*

Having reviewed the ten material breaches alleged by Southeast Diamond, we have determined that Uma Shiv breached the Lease in minor fashion only through allowing those violations of the City code to exist within Gas Express that could have been promptly corrected and were not (paragraph four of the Lease) and through some delayed payment of the water utility bill (paragraph ten of the Lease). Moreover, we have determined that the evidence preponderates in favor of the trial court's findings that these minor breaches were cured by Uma Shiv and did not rise to the level of material breaches of contract.

On appeal, Southeast Diamond posits that the trial court erred by failing to consider "the effect of multiple breaches," stating that "perhaps a single breach of the Lease in the categories listed above would not have been material, but taken together, under the totality of the circumstances, these breaches together constitute a material breach." We disagree.

In support of this position, Southeast Diamond relies on this Court's decision in *Salley v. Pickney Co.*, 852 S.W.2d 240 (Tenn. Ct. App. 1992), which we find to be highly factually distinguishable from the case at bar. *Salley* involved an action for breach of a construction contract wherein the homeowners/plaintiffs presented evidence of a truly astounding number of construction flaws. *See Salley*, 852 S.W.2d at 242-45. The *Salley* Court determined that "[t]he plaintiffs' expert testimony showed that the cumulative effect of the defects caused by the Contractors rendered the Contractors' performance unworkmanlike, thereby constituting a breach of contract." *Id.* at 244. In contrast, Uma Shiv committed only two minor breaches of the Lease that it subsequently cured. The

32

trial court did not err in determining that Southeast Diamond failed to carry its burden of proof to establish a material breach of the Lease.

V.  Written Notice and Opportunity to Cure

Southeast Diamond has raised a separate issue contesting the following determinations by the trial court in its final judgment:

[Southeast Diamond] failed to comply with the lease requirement to provide written notice to [Uma Shiv] of any alleged breaches/defaults, with opportunity to cure—though any such breaches/defaults have in fact been cured.

* * *

Any alleged breaches, if any, not only can be remedied by compensation or otherwise, they have been.  All have been cured, including at expense to [Uma Shiv].  [Southeast Diamond] has been placed in the same condition as if any alleged breach had not occurred.

(Internal citations to record omitted.)  Southeast Diamond posits that under paragraph thirteen of the Lease, it was required to give written notice solely for monetary breaches and then offer only a ten-day period for the breach to be cured.  Paragraph thirteen of the Lease provides:

In addition to any other rights and remedies to which Lessor may be entitled, if Lessee shall fail to pay the rent as herein provided, as and when the same shall become due and payable, or shall fail to keep or perform any of the covenants specified herein, and such rent or other default shall not be paid within then (10) days in the case of money obligations after written notice to Lessee by Lessor, then this Lease Agreement, at the option of Lessor, shall be terminated and Lessor may take possession and shall be entitled to re-enter the Leased Premises, excluding Lessee therefrom and to hold the Leased Premises and re-lease the same.  Lessee shall be responsible for all court costs, legal fees and other reasonable expenses incurred by Lessor in enforcing this provision.

*See generally Forrest Constr.*, 337 S.W.3d at 229 ("As a general rule, a party alleging defects in the performance of a contract is required to give notice and a reasonable opportunity to cure the defects.").

In an earlier section of this opinion, we have considered Uma Shiv's correction of violations cited by the City and full payment of outstanding water utility bills as evidence in support of the trial court's finding that any breaches or defaults were cured by Uma Shiv. In turn, we have considered these cures within the analysis of whether the breaches rose to the level of being material. *See Cooper*, 578 S.W.3d at 46 (noting as a factor to be considered for materiality of a breach "[t]he likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances"). We have determined that the trial court did not err in finding no material breach of contract. We therefore conclude that any further issue concerning whether Southeast Diamond was required to give notice and an opportunity to cure or whether Uma Shiv did cure any minor breaches is pretermitted as moot.

## VI. Attorney's Fees

In the conclusion of its principal brief, Southeast Diamond states regarding attorney's fees: "The Plaintiff asks this court to . . . award it judgment for its attorney's fees and costs in litigating this case pursuant to Paragraph 13 of the Lease in an amount to be determined upon a remand to the Trial Court for findings on that issue." Southeast Diamond then repeats this request in the conclusion of its reply brief. As our Supreme Court has explained:

> Appellate review is generally limited to the issues that have been presented for review. Tenn. R. App. P. 13(b); *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007). Accordingly, the Advisory Commission on the Rules of Practice and Procedure has emphasized that briefs should "be oriented toward a statement of the issues presented in a case and the arguments in support thereof." Tenn. R. App. P. 27, advisory comm'n cmt.

*Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012); *see also Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) ("We may consider an issue waived where it is argued in the brief but not designated as an issue."). Inasmuch as Southeast Diamond failed to raise this as an issue in its statement of the issues, we deem Southeast Diamond's request for an award of attorney's fees to be waived.

## VII. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court dismissing this action. We remand this case for collection of costs below. Costs on appeal are taxed to the appellant, Southeast Diamond Jubilee Investments, LLC.

_____
THOMAS R. FRIERSON, II, JUDGE